George Eilperin, J.
Petitioners, former students of St. John’s University, New York, request this court pursuant to article 78 of the Civil Practice Act to issue an order directing the university (1) to place petitioner Howard Glenn Carr on the graduation list of January, 1962 for receipt of his degree in June, 1962, (2) to reinstate petitioners Greta Schmidt Carr and Jean Catto in their classes for fulfillment of the requirements of their respective courses and (3) to issue an official college transcript of the work completed by petitioner Howard Glenn Carr. It is to be noted that coincidentally with the commencement of this proceeding the university issued to petitioner Howard Glenn Carr an official transcript of the work completed by him. Accordingly the issue with respect to such relief need not be determined.
In September, 1957 Howard Glenn Carr matriculated at the university for the degree of Bachelor of Science and completed all of his courses and examinations successfully in January, 1962 and paid all tuition fees and charges as required by the university. At that time he was eligible to be placed on the graduate list for receipt of his degree at the June, 1962 commencement. Petitioners Greta Schmidt Carr and Jean Catto matriculated in September, 1958. On April 18, 1962 all were dismissed from the university. At the time of the dismissal of Greta Schmidt Carr and Jean Catto they had successfully completed three and a half years of courses required toward the degree of Bachelor of Arts and were engaged in the final half year of studies, the successful completion of which would ordinarily entitle them, to be graduated.
*320 St. John’s University is an educational corporation originally incorporated in 1871 under the general laws authorizing the incorporation of benevolent, charitable, scientific and missionary societies, and since December 13, 1906 has been operating by virtue of a charter and several amendments thereto, issued by the Board of Regents of the University of the State of New York. It is operated and conducted by priests of the Order of the Congregation of the Mission, a Roman Catholic order of priests. The university’s general objective, as stated in its bulletins, is the offering of “ such opportunities to achieve traditionally classical and professional education as will enable men and women to develop in learning and culture according to the philosophical and theological principles and traditions of the Roman Catholic Church.” Although admission to study in the university is open to qualified applicants, irrespective of religious faith, over 94% of the students attending the university are of Roman Catholic faith. The petitioners are members of that faith.
On March 13,1962 petitioner Howard Glenn Carr married the petitioner Greta Schmidt before a City Clerk of the City of New York at the Municipal Building in Brooklyn, New York. The marriage was witnessed by petitioner Jean Catto and John Sharkey, another student of the university, also of the Catholic faith, who, although having been similarly dismissed from the university, is not a party to this proceeding.
According to Canon Law of the Roman Catholic Church, Catholic parties to a marriage are required to be married before a Catholic priest and two witnesses. A civil marriage is invalid in the eyes of the Catholic Church and is not recognized as the fulfillment of the marriage contract which is deemed sacred and of religious nature and the participation in such a marriage either as a party or as a witness is deemed seriously sinful.
On April 6,1962 the university became aware of the marriage. On April 9 the petitioners and John Sharkey were notified that a hearing of charges against them would be heard on April 11 by the “ Committee on Student Integrity,” a body consisting of, among others, the dean of men, the dean of women and representatives from various departments of the university. The petitioners and John Sharkey attended the hearing. The committee found that all the participants to the marriage ceremony did not give satisfactory explanation for their failure to uphold their obligations as Catholic students at a Catholic university and omitted to explain their failure to seek advice and counsel of a priest either at the university or in their own parishes. It thus recommended to the executive committee of the *321 university's trustees that the petitioners and John Sharkey should be dismissed from the rolls of the university.
On April 12, 1962 the executive committee reviewed the proceedings of the hearing before the committee on student integrity and voted to sustain the committee’s recommendation. On that morning Jean Catto and John Sharkey were notified orally of the executive committee’s decision. On the same day petitioners Howard Glenn Carr and Greta Schmidt Carr were again married, this time before a priest in a Roman Catholic church in the presence of Jean Catto and John Sharkey as witnesses. On April 18, 1962 they were formally notified of their dismissal by letter from the vice-president for student personal services. The letter to petitioners Howard Glenn Carr and Greta Schmidt Carr reads as follows:
“ The Executive Committee of the Board of Trustees of St. John’s University has requested me to inform you that you have been dismissed from the University because of your action relative to an attempted marriage in the presence of a civil officer.
“ This action is contrary to ecclesiastical law, making it gravely sinful and has become a source of public scandal. As such it is subject to the regulation stated in the 1961-62 bulletin of University College which reads
“ 1 In conformity with the ideals of Christian education and conduct, the University reserves the right to dismiss a student at any time on whatever grounds the University judges advisable. Each student by his admission to the University recognizes this right.
‘ ‘ ‘ The continuance of any student on the roster of the University, the receipt of academic credit, graduation, the granting of a degree or a certificate, rests solely with the powers of the University. ’
“ The matter is especially serious in light of the recent pronouncement of the Vatican condemning the light and frivolous attitude of modern society in regard to the sacred contract of holy matrimony.”
The letters sent to Jean Catto and John Sharkey are similar in content except that the reason for dismissal is set forth as follows: 11 because of your participation as a witness at an attempted marriage in the presence of a civil officer.”
The petitioners, in substance, urge that since the university is a quasi-public institution, chartered by the State and subject to its control, secular and not religious, with its doors open to the education of the public, irrespective of religious faith, it may not deny the rights of students for an act in violation of *322 ecclesiastical law, especially where the act is sanctioned by civil law and supported as moral and that such action violates the First Amendment of the Constitution of the United States.
The university urges that the petitioners are bound by the terms of regulations on discipline, having agreed thereto each time they were admitted to the university and accordingly, ‘ ‘ In conformity with the ideals of Christian education and conduct ’ ’ the university was free to dismiss the petitioners at any time 11 on whatever grounds the University judges advisable. ’ ’ It is further urged that the action by the university was within its discretionary powers which may not be disturbed by this court.
A student may seek the review of the action of a university in dismissing him from the school or refusing a degree if tiie action of the university was arbitrary, capricious, unreasonable or illegal. (People ex rel. Cecil v. Bellevue Hosp. Med. Coll. of the City of N. Y., 60 Hun 107, affd. 128 N. Y. 621; People ex rel. Goldenkoff v. Albany Law School, 198 App. Div. 460; Baltimore Univ. v. Colton, 98 Md. 623.) When, however, the facts justify the discretion exercised, review will be denied (People ex rel. O’Sullivan v. New York Law School, 68 Hun 118; Matter of Edde v. Columbia Univ., 8 Misc 2d 795, affd. 6 A D 2d 780, appeal dismissed 5 N Y 2d 881, cert. denied 359 U. S. 956; Matter of Beatty v. Board of Managers of Binghamton City Hosp., 130 Misc. 181).
The power of suspension or expulsion of students is an attribute of government of educational institutions (Goldstein v. New York Univ. 76 App. Div. 80) but it does not follow that the institution has the right to terminate relations with the student at any time. Upon admission to a college there is an implied understanding that the student’s studies at the university would not be made fruitless, nor graduation and a degree made impossible by an arbitrary refusal to permit further attendance. (Booker v. Grand Rapids Med. Coll., 156 Mich. 95.) However, in addition to the foregoing understanding there is also the implied understanding that the student will submit himself to reasonable rules and regulations for the breach of which, in a proper case, he may be expelled (Goldstein v. New York Univ., supra). With respect to these rules and regulations the courts will not consider whether they are wise or expedient but whether they are a reasonable exercise of power and discretion of the college authorities (11 C. J., Colleges and Universities, § 31; Gott v. Berea Coll., 156 Ky. 376).
It is our State policy, as enunciated in section 313 of the Education Law, that “It is a fundamental American right for members of various religious faiths to establish and maintain *323 educational institutions exclusively or primarily for students of their own religious faith or to effectuate the religious principles in furtherance of tvhich they are maintained. Nothing herein contained shall impair or abridge that right.” (Emphasis supplied.)
In view of this policy it cannot he insisted that a secular private university, operated to further a particular religious ideal, may not require its students to abide with rules and regulations promulgated in the discretion of the college’s authorities in order to effectuate its purpose, notwithstanding the fact that the rules and regulations pertain to purely religious matters, as opposed to secular matters, and notwithstanding the fact that such rules and regulations prohibit acts sanctioned by civil law and supported as moral.
It is a well-known fact that such institutions do generally adopt regulations of such nature and that with rare exception those attending them yield cheerful obedience thereto. Many esteem it a privilege to be allowed to attend such universities and parents placing their children in these universities often desire that they shall be brought under such influences. Shall a court say that such rules and regulations may not be imposed upon students merely because one or more of them may object to obeying them? It would appear that the appropriate solution is that those who do not wish to conform may seek their schooling elsewhere. Nor can it be said that since the university admits students of all religious faiths, rules and regulations to effectuate a particular religious belief are improper. Whether or not to compel students of faiths other than that which the university professes, to adhere to rules and regulations requiring compliance with the university’s religious practices is not before this court and need not be decided.
No constitutional question is involved with respect to any such regulations. Constitutional provisions insofar as they relate to religion proscribe governmental action and do not erect a shield against merely private conduct, however discriminatory or wrongful (Zlotowitz v. Jewish Hosp., 193 Misc. 124, affd. 277 App. Div. 974; U. S. Const., 1st & 14th Amdts.; N. Y. Const., art. I, § 3). St John’s University is a private enterprise and not a public institution. A college or university founded by private enterprise and endowed or supported by private donations is a private eleemosynary institution (Trustees of Dartmouth Coll. v. Woodward, 17 U. S. 518). To say that the university, though a private corporation, is affected with a public interest is to beg the question. A private educational institution is not in a business so essential to the public in its nature *324 as to render a corporation so engaged subject to public control. In no aspect is St. John’s University the agency of the State in respect of religious matters.
The rule of reasonableness however requires that the regulations in question be subjected to the test whether or not they are certain as to their meaning. If they are ambiguous and uncertain they must be condemned (Wilner v. Department of Health, 5 Misc 2d 331). They should be sufficiently explicit to inform those who are subject to them what conduct on their part will render them liable to its penalties.
As heretofore observed, the petitioners were dismissed pursuant to the authority of a regulation which states: “In conformity with the ideals of Christian education and conduct, the University reserves the right to dismiss a student at any time on whatever grounds the University judges advisable.”
This provision is so vague and indefinite that men of common intelligence must necessarily conjecture as to its meaning and differ as to its application. Does it mean that in deciding whether or not a student shall be dismissed the university shall conform in its determination to the ideals of Christian education and conduct or does it moan that the university may dismiss a student if he does not conform with the ideals of Christian education and conduct! If the former meaning may be applied to it then no standards of conduct are set forth for the student and accordingly the student could not be dismissed for the violation of any religious law. If the latter meaning is attached to it we are confronted with the fact that there are many acts which are not acts of religious conduct and which for many men have no religious significance and are entirely unrelated to the practice of any religion, principle or tenet but which may involve a violation of an obligation which other men may think is imposed upon them by divine command or religious authority. To require students to conform with ‘ ‘ ideals of Christian education and conduct ’ ’ takes on a variety of meanings, each subject to different interpretation by students of different backgrounds. A regulation subject to such diversity of meaning is not sufficiently clear to mandate a course of conduct standard in application. .Because of this unexplicitness it is my view that the petitioners should not have been subjected to the penalties imposed by the university and accordingly I grant their petition and annul the determination of the university.