**LEXINGTON THEOLOGICAL SEMI-NARY, INC., Appellant,**

v.

**Ottie David VANCE, Appellee.**

**Ottie David VANCE, Cross-Appellant,**

v.

**LEXINGTON THEOLOGICAL SEMI-NARY, INC., Cross-Appellee.**

Court of Appeals of Kentucky.

May 18, 1979.

Herbert Sledd, William H. McCann, Brown, Sledd, McCann, PSC, Lexington, for appellant/cross-appellee.

Richard N. Rose, Lexington, for appellee/cross-appellant.

Before COOPER, HOWARD and HOWERTON, JJ.

HOWARD, Judge.

This is an appeal from a judgment entered in the Fayette Circuit Court ordering the Lexington Theological Seminary, Inc. (the defendant below) to grant a Master of Divinity graduate degree to Ottie David Vance (the plaintiff below), an admitted homosexual.

The trial court decided this case on a contractual basis. Briefly summarized, the trial court determined that the catalog issued by the Lexington Theological Seminary, Inc. (hereinafter referred to as the Seminary) fulfilled the requirements of a contract between the Seminary and Ottie

David Vance (hereinafter referred to as Vance). The trial court further determined that Vance had fulfilled all the academic and financial requirements needed as prerequisites for the granting of a degree. The court held that the catalog did not set forth reasonably clear standards concerning character traits and that none of the contract terms made clear that the Seminary could refuse to grant a degree to Vance because he was a homosexual.

Vance enrolled in the Seminary in September of 1972. In September, 1974, Vance applied to the faculty for admission to the degree candidacy program. The application was deferred until Vance fulfilled certain requirements relating to field experience.

Unbeknownst to the faculty or administrative staff of the Seminary, Vance was a homosexual and had actively engaged in this life style for a number of years. In September, 1975, Vance advised Dean Roy Graham of the fact that he was a homosexual, that he lived a homosexual life style and had been "married" to another man for six years, and that he now desired to come out of the closet. Dean Graham advised Vance to meet with Dr. Wayne H. Bell, president of the Seminary. Vance met with Dr. Bell and told him of his homosexual life style.

Dr. Bell emphasized to Vance that his life style and practice of homosexuality could impair the granting of a degree by the Seminary. Vance was advised that even if he met the academic requirements and was admitted to the degree candidacy program, neither of these factors guaranteed that he would be granted a degree. Vance testified that he was aware that the faculty and Board of Trustees must approve the granting of a degree and that he knew there was some question as to whether the faculty and/or the Board of Trustees would approve.

In January, 1976, Vance was informed that his application for degree candidacy was again being deferred until he could complete one particular course during the spring semester. Vance took the course and successfully completed it. In May, 1976, the faculty recommended that Vance receive his Master of Divinity degree. The Executive Committee voted not to approve the faculty recommendation and the full Board of Trustees subsequently ratified the Executive Committee's decision not to grant Vance a degree. Vance thereafter instituted suit, seeking to have his degree conferred.

Vance also sought compensatory damages for lost wages and the award of attorney's fees. The trial court held that Vance failed to prove any damages he sustained and did not award attorney's fees. These two issues are the subject of Vance's cross-appeal.

The Seminary argues three issues on appeal: 1) That the order compelling the conferring of the degree was a violation of the First Amendment right to freedom of religion; 2) that Vance failed to prove any contract between the parties and failed to prove a breach of contract by the Seminary or the fulfillment of obligations by Vance; and 3) that any alleged contract was rendered void because of Vance's failure to reveal that he was a homosexual at the time of admission to the Seminary.

This Court will not discuss the First Amendment argument since this Court believes, as did the trial court, that this is a contract case. This Court differs with the trial court in that this Court believes that reasonably clear standards concerning character were set forth in the catalog.

■ The terms and conditions for graduation from a private college or university are those offered by the publications of the college at the time of enrollment and, as such, have some of the characteristics of a contract. *University of Miami v. Militana*, Fla.App., 184 So.2d 701, 704 (1966).

■ College regulations defining student conduct, challenged on the ground of vagueness, are not judged by the degree of specificity required for penal statutes. Neither are these regulations used in a vacuum, but rather they should be interpreted in the context of their intended import. *Depperman v. University of Kentucky*, 371 F.Supp. 73, 78 (E.D.Ky.1974). In *Depper-*

*man*, the court held that the following regulation was not vague:

> Any student may be denied permission to continue enrollment in the College of Medicine if, in the opinion of the Faculty Council, his knowledge, character or mental or physical fitness cast grave doubts upon his potential capabilities as a physician.

In the instant case, the portions of the catalog for the school year 1972–1973, which are relevant to this case, read as follows:

1) The introductory page, entitled "Education For Ministry", contains the following two paragraphs:

> Lexington Theological Seminary is engaged at the graduate level in professional education for the Christian ministry. Finding its charter in the gospel transmitted through the Bible and borne through history by the ongoing life of the church, it seeks to equip its graduates to serve as contemporary servants of that gospel.
>
> .  .  .  .  .
>
> By the time of graduation, students are expected, having worked through problems of vocational indecision, to be firmly committed to the role and mission with which they will begin their ministry.

2) The Master of Divinity Program is described in the following paragraph:

> The Master of Divinity program is a three-year course of study and is designed for those who desire to become pastors of local congregations, leaders of religious education, religious leaders at the state and national level, ministers of music, campus ministers, chaplains in hospitals and in the armed forces, missionaries, and leaders in other specialized ministries.

3) The explanatory section for the application for degree candidacy contains the following paragraph:

> At the time of his application for candidacy, the student's overall seminary profile, including academic performance, field education leadership, financial responsibility, and fundamental character, is evaluated by the faculty. No student on probation may [be] admitted to candidacy.

4) The admissions standards and policies section contain the following paragraph:

> Lexington Theological Seminary will consider for admission applicants who hold the B.A. degree or its equivalent. Preference will be given to graduates of accredited institutions who have concentrated in the liberal arts, maintained a minimum of B average in their pre-seminary studies, and display traits of character and personality which indicate probable effectiveness in the Christian ministry.

The trial court believed that the Seminary should have defined what it meant and expected by the use of such words and phrases as "Christian ministry", "gospel transmitted through the Bible", "servants of the gospel", "firmly committed to the role and mission with which they will begin their ministry", "fundamental character" and "display traits of character and personality which indicate probable effectiveness in the Christian ministry." The trial court stated that, although the use of these words and phrases might be clear to the Board of Trustees, the meanings of these words and phrases were not clear to it [the trial court].

We disagree. Those words "can be easily understood by anyone who possesses the intelligence to gain admission to an accredited institution of higher learning." *Papish v. Board of Curators of University of Missouri*, 464 F.2d 136, 143 (8th Cir. 1972) reversed on other grounds, 410 U.S. 667, 93 S.Ct. 1197, 35 L.Ed.2d 618 (1973).

█ Besides having meaning to anyone with enough intelligence to be admitted to a college, we believe that these words should have even greater meaning to a student who is actively seeking a degree in a religious field of study. We do not believe that the words and phrases used in the catalog were vague or indefinite.

In *Carr v. St. John's University, New York*, 34 Misc.2d 319, 231 N.Y.S.2d 403,

reversed 17 App.Div.2d 632, 231 N.Y.S.2d 410, affirmed 12 N.Y.2d 802, 235 N.Y.S.2d 834, 187 N.E.2d 18 (1962), a Catholic university regulation stated that, in conformity with the ideals of Christian education and conduct, the university reserved the right to dismiss a student on whatever grounds the university deemed advisable. A divided court held that the dismissal of four students, two of whom were married in a civil ceremony and two of whom acted as witnesses, was within the discretion of the university and that the court could not review the exercise of that discretion.

The Seminary asserts that the order compelling the conferring of the graduate degree to Vance was a violation of the First Amendment. Again, we do not feel bound to decide this case on First Amendment grounds, but rather on the basis of whether the Seminary breached its contract to Vance by refusing to grant him his degree.

The courts will not generally interfere in the operations of colleges and universities, especially in actions challenging the institution's academic regulations, since the courts possess minimum expertise in this area. *Depperman v. University of Kentucky, supra*, at pg. 76.

In 15A Am.Jur.2d *Colleges and Universities* § 31, at pgs. 292–293, appear the following statements concerning the conferring of degrees by a university:

Universities and colleges are usually vested with the power to graduate and to confer degrees and diplomas on students who have complied with the requirements imposed by the regulations of such institutions. Where a student matriculates at a college or university, a contractual relationship is established under which, upon compliance with all the requirements for graduation, he is entitled to a degree or diploma. However, the faculty or other governing board of a college or university, which is authorized to examine the students and to determine whether they have performed all the conditions prescribed to entitle them to a degree or diploma, exercises quasi-judicial functions, *in which capacity its decisions are conclusive, except that a degree or diploma may not be refused arbitrarily.* (emphasis ours).

It is true that the Seminary is essentially a private graduate school. However, its main emphasis is on the training and education of people who desire to become involved in the Christian ministry. In this connection, Vance fully intends to become a minister and was not seeking this degree for any other purpose.

The trial court specifically held that it was not deciding the morality of homosexuality in this particular case, even though it can be a criminal offense under Kentucky law, KRS 510.100. Although this case can be decided under contract law, the question of morality of homosexual Christian ministers must be of overriding importance to an institution such as we have here that is engaged in the business or calling of training persons for the Christian ministry. It begs the question for Vance to argue that the secular world is becoming more tolerant of homosexuality as a viable life style. This conclusion on his part is speculative, but even if it is true, this argument is not relevant to the issues in the case.

Although we are living in a society that is more permissive in many respects than the societies in the recent past, the argument that Christian denominations or other religious groups should adopt the life style and morals of some segments of the population at any given time is ridiculous on its face. This type of argument can be made for gaining approval for many different activities which are completely contrary to the teachings of the Christian religion.

The Lexington Theological Seminary is an old and illustrious Seminary that has prepared ministers to preach the Christian gospel in the Disciples of Christ Church and other denominations. Therefore, it has the most compelling interest in seeing that its graduates who go forth with a Divinity degree, bearing the name and approval of the Lexington Theological Seminary, shall be persons possessing character of the highest Christian ideals. Therefore, the Board

of Trustees of the Lexington Theological Seminary had every right, and it was their strict duty, to exercise sound discretion in the matter of granting a degree to Ottie David Vance.

In view of the circumstances shown in this case, we do not find that the Board exercised its discretion in an arbitrary manner or that same was abused. The trial court's decision in ordering the Seminary to grant Vance a Divinity degree was clearly erroneous. Furthermore, there was no estoppel shown precluding the denial of the degree by the Seminary. Vance proceeded to finish his studies at his own risk, after he revealed his homosexual life style. He was warned by the Seminary that this revelation might preclude the degree being granted.

The judgment of the trial court is reversed on the appeal and is affirmed on the cross-appeal. The trial court shall dismiss the complaint.

COOPER, J., concurs.

HOWERTON, J., dissents.

HOWERTON, Judge, dissenting.

I cannot agree with the opinion of my colleagues, although I am sympathetic with the desire of the trustees to withhold the seminary's degree from an avowed homosexual. For me, the problem of the seminary falls primarily on the actions, or inactions, of the dean, the president, and the faculty. If those seminary leaders cannot stand up for what is supposed to be right, then why should we expect the student, Vance, to interpret the meaning of the language in the catalog to exclude him from eligibility for a degree. Since neither the dean, the president, nor the faculty understood the catalog to clearly exclude homosexuals, their view certainly clouds any contrary meaning.

The trial court found the language in the catalog to be too ambiguous to exclude a homosexual such as Vance. Under the circumstances in this case, I agree. Except for the indecisiveness of the dean and the president, however, I would have agreed with the majority opinion and concluded that anyone intending to become a minister in any Christian denomination should understand, or at least soon know, the attitudes toward homosexuality as are expressed in both the Old and New Testaments of the Bible.

Once the dean and the president were aware of Vance's intention to continue living as a homosexual, they could have reasonably expelled him. Such a decision would obviously have been upheld by all members of this panel, if Vance had bothered to challenge such a dismissal.

Vance voluntarily gave the dean and president this information in September, a whole school year before his time for graduation. At the beginning of his final semester, the seminary accepted more tuition, and Vance was advised what he must do to complete the requirements for the degree. Vance did all of these things and was then recommended for a Masters Degree by the faculty. Therefore, in addition to agreeing with the trial judge's finding that the catalog did not exclude homosexuals, I must also conclude that the seminary should be estopped from denying Vance his degree. The fact that Vance was given some weak warning would not overcome this.

I can certainly understand why the Board of Trustees would not wish to grant Vance a degree from the Lexington Theological Seminary, Inc., but granting the degree does not ordain Vance to become a minister in any church. Furthermore, degrees have been granted by this seminary to others who did not intend to become Christian ministers. For that matter, degrees have been granted to non-christians, who merely desired to become educated in the teachings of the seminary. In the future, the Board should consider revising the catalog to be more explicit on what is meant by "fundamental character." The Board might also make it clear that applications for degree candidacy will not only be "evaluated by the faculty" but will also be reviewed by the Board.

The seminary raised a question regarding religious freedom and the separation of church and state. Under the peculiar circumstances in this case, and considering the nature of this particular seminary, I do not find that the trial court's judgment violates the constitutional requirements of religious freedom and the separation of church and state. The seminary also argued that Vance's original enrollment was based on fraud or mistake which would render any contract void. This point would be valid only if the catalog "contract" could be interpreted to exclude homosexuals. Since I have concluded that the language has been rendered meaningless, Vance's failure to disclose his life style and feelings on this moral issue could not constitute fraud on his part. This argument might have carried considerable weight, and the changed circumstances would probably have brought a different result, if Vance had not disclosed his homosexuality until he had completed all academic requirements for his degree.

Finally, I agree with the trial judge in that Vance proved no damages. Therefore, I would affirm the judgment of the trial court on the appeal and the cross-appeal.