**CENTRE COLLEGE; Michael Adams; Milton Reigelman; Julie McGuigan King; Richard Grewe; and Gary Bugg, Appellants,**

v.

**Peter TRZOP, Appellee.**

No. 2000–SC–1102–DG.

Supreme Court of Kentucky.

Dec. 18, 2003.

As Modified Jan. 30, 2004.

As Modified on Denial of Rehearing March 18, 2004.

Kenneth Gregory Haynes, Michelle Turner, Wyatt, Tarrant & Combs, Louisville, Robert L. Chenoweth, Chenoweth Law Office, Frankfort, Counsel for Appellant.

David R. Marshall, Lexington, Counsel for Appellee.

GRAVES, Justice.

### FACTS

Centre College is a private institution of higher education located in Danville, Kentucky. In 1995, while a junior at Centre, Appellee, Peter Trzop was dismissed for possession of a deadly weapon in his dormitory room. Specifically, he was found to have in his possession a survival knife with a blade over five inches in length, a direct violation of the Centre Student Handbook.

The Handbook prohibits the possession of dangerous weapons by students, and stipulates that dismissal is a possible consequence for possession of such weapons.

Centre became aware of Trzop's ownership of the knife after Jim Pokorny, Trzop's roommate, informed students Mike Snarr and Janine Szymanski, Snarr's girlfriend, of a conversation in which Trzop stated that he wanted to harm Snarr. Pokorny recounted that Trzop wanted to obtain a position of authority wherein he could kill Snarr and "get away with it." Szymanski stated in her deposition that she took the threats very seriously because of Trzop's recent behavioral changes and isolation from friends. In fact, Szymanski was so concerned that she went to her psychology professor, Dr. Brown, and, without providing names, informed him of the threats. Following the advice of Dr. Brown, Szymanski went to see the Dean of Students, Nancy Lackey. Upon learning that Dean Lackey was out of town, Szymanski informed Julie McGuigan (now King), Director of Student Activities and Greek Life, of the situation. Szymanski reported that she was afraid for her safety and the safety of Mike Snarr.

McGuigan immediately contacted Milton Reigelman, Centre College Vice–President, and the two met with Snarr, who confirmed Szymanski's report and stated that he believed Trzop had a "large knife" in his possession. McGuigan and Reigelman thereafter sought the advice of Jane McCune, a mental health specialist with Bluegrass Regional Mental Health Center, to assess the level of potential danger the situation posed. McCune advised them to contact the police.

After consulting by telephone with Dean Lackey, Reigelman and McGuigan determined that Trzop's room should be searched and that they should meet with him after the search to discuss the situa-

tion. At some point prior to the meeting, Reigelman prepared a letter of dismissal, as a contingency in the event a weapon was, in fact, found.

A search of Trzop's room revealed three pocket-type knives and one large Army survival knife with a blade over five inches long. Following the search, Reigelman met Trzop after his class and accompanied him to a conference room. Also present were McGuigan, McCune, and two campus security officers. Reigelman had requested that McCune be present to assess Trzop's emotional state, such as the likelihood that he would attempt to harm himself or others if dismissed.

McGuigan informed Trzop that some students had complained about threats he had made, and that a weapon had been found during a search of his room. Trzop did not deny the allegation of threats and explicitly acknowledged ownership of the survival knife.

Reigelman thereafter gave Trzop the letter of dismissal. Reigelman later stated that he had carefully chosen the word "dismissal," as opposed to expulsion or suspensions, when drafting the letter in order to take immediate action that would remove Trzop from campus and defuse the situation, with the hope that Trzop could later return to Centre. Reigelman explained to Trzop that he could be readmitted if he agreed to psychiatric treatment and evaluation as specified by Centre. Additionally, Centre required that Trzop's "attitude" change before it would consider any request for re-admission.

In 1996, Trzop filed suit in the Boyle Circuit Court, claiming that his due process rights had been violated by Centre. He alleged that he was not given adequate notice of the pre-dismissal meeting, and was denied the opportunity to defend himself, or to call witnesses on his behalf.

The complaint asserted: (1) a contractual due process claim; (2) a state statutory due process claim via KRS 446.070; (3) a constitutional due process claim via 42 U.S.C. § 1983; and (4) a defamation claim.[1]

In February 1999, the trial court entered summary judgment in favor of Centre College. The trial court found that Trzop's contractual due process claim failed as a matter of law because the Centre Student Handbook expressly prohibited possession of a dangerous weapon and clearly "reserve[d] to the college administration the right to invoke sanctions including dismissal [outside the student judiciary process] in unusual circumstances." Further, the trial court found Trzop's KRS 446.070 claim legally deficient because no state statute was alleged to have been violated and the regulations relied upon by Trzop could not support such a claim in the absence of negligence. In any case, however, the trial court found that due process was, in fact, provided to Trzop, so there was no regulatory violation. Finally, the trial court ruled as a matter of law that Centre College did not act in an arbitrary and capricious manner:

> Given the totality of the circumstances, Centre's right to compel order on its campus, and the duty to protect others in the college community-the administration's conduct was reasonable and fair. It is evidence of good faith that the letter of dismissal referred the plaintiff to the procedure for readmission; and it is further evidence of good faith that Trzop and the college commenced meetings and communications regarding readmission [following Trzop's dismissal.]

On appeal, Trzop again argued that KRS 164.945–164.947 and related regulations impose due process requirements on private colleges and a violation thereof could make Centre liable under KRS 446.070. Specifically, KRS 164.947 requires that non-public colleges be licensed. Regulations adopted pursuant to the statute require that to be licensed a non-public college must establish policies and procedures to ensure that all students receive due process. 13 KAR 1:020 Section 7(11)(h).

The Court of Appeals reversed the trial court's decision, finding that KRS 164.945–164.947 apply to *all* state colleges and universities, both public and private. It also concluded that 13 KAR 1:020 Section 7(11)(h) requires that, as a condition for being licensed to bestow college diplomas to students, a non-public college must establish policies and procedures whereby all students are ensured due process. The Court of Appeals ultimately held that, "the law entitles students at private colleges due process in any disciplinary proceeding," and thus summary judgment in favor of Centre College was improper. Centre College thereafter sought discretionary review in this Court. For the reasons set forth herein, we reverse the decision of the Court of Appeals and reinstate the trial court's order of summary judgment.

### ARGUMENT

**I. KRS 446.070 DOES NOT AUTHORIZE RECOVERY FOR A VIOLATION OF AN ADMINISTRATIVE REGULATION IN THE CONTEXT OF THIS CONTROVERSY.**

■ KRS 446.070 states:

Penalty no bar to civil recovery

A person injured by the violation of any *statute* may recover from the offender such damages as he sustained by reason of the violation, although a penalty or

---

1. In January 1999, Trzop dismissed the defamation and constitutional due process claims.

forfeiture is imposed for such violation. (emphasis added)

In accepting Trzop's argument that KRS 164.945–164.947 apply to all state colleges (public and private) and that 13 KAR 1:020 § 7(11)(h) promulgated thereunder require private colleges, such as Centre, to establish policies and procedures whereby all students are ensured due process, the Court of Appeals concluded that he could recover under KRS 446.070 for Centre's alleged violation of Kentucky's administrative regulations adopted pursuant to KRS 164.945–.947.

The Court of Appeals relied upon this Court's decision in *Grayson Fraternal Order of Eagles v. Claywell*, Ky., 736 S.W.2d 328 (1987). In fact, *Grayson* concerned the issue of dram shop negligence liability, not the applicability of KRS 446.070 to violations of administrative regulations. Furthermore, *Grayson* involved the violation of a statute, KRS 244.080, not an administrative regulation. Nowhere in *Grayson* does this Court explicitly state that KRS 446.070 applies to violations of administrative regulations. The only reference to the statute is as follows:

> KRS 446.070 is styled, "*Penalty no bar to civil recovery.*" It provides that "[a] person injured by the violation of any statute may recover from the offender such damages as he sustained by reason of the violation, although a penalty or forfeiture is imposed for such violation." The purpose of this statute is to permit a person injured by the violation of a statute to recover damages by reason of

the violation. *Allen v. Lovell's Adm'x*, 303 Ky. 238, 197 S.W.2d 424 (1946). For instance, this rule has been applied to recognize a cause of action on behalf of a fire victim where the apartment building lacked adequate exits as required by the Building Code, *Higgins Investments Inc. v. Sturgill*, Ky., 509 S.W.2d 266 (1974), and to recognize a cause of action on behalf of a child visiting a tenant when the child was scalded as the result of a violation of the Plumbing Code, *Rietze v. Williams*, Ky., 458 S.W.2d 613 (1970).

*Id.* at 333.

We would point out that in *Rietze, supra*, our predecessor court held "Administrative regulations, properly adopted and filed have the force and effect of law, KRS 13.081, and as observed by Chief Judge Swinford in *Home Insurance Co. v. Hamilton*, 253 F.Supp. 752 (E.D.Ky.1966), there is no reason why they should be considered differently, in the aspect here presented, from statutes or ordinances." *Rietze, supra*, at 617. However, the *Rietze* decision was predicated upon KRS 13.081 [2], which was repealed in 1974. As such, *Rietze* is hereby overruled insofar as it relies on KRS 13.081 [repealed] for the proposition that KRS 446.070 allows recovery for violation of an administrative regulation.

■ In Kentucky, administrative regulations do have the force and effect of law when they have been duly promulgated and are consistent with the enabling legis-

2. 13.081. Agencies may adopt regulations Effect Limitation—

Unless otherwise provided by law each agency may adopt reasonable regulations to implement administration of the functions assigned to it by law, and shall adopt such regulations as are necessary to the proper execution of those functions. If prepared and filed in accordance with the provisions of chapter 13 of the Kentucky Revised Statutes, *such regulations shall have the force of law* and be enforced by all law enforcement officers. In every other instance, the power to adopt regulations to implement a particular function is limited by the terms of the grant of authority under which the function was assigned.

lation. *Hamilton, supra,* at 755. All the cases supporting recovery for regulatory violations involve safety regulations adopted pursuant to the exact mandate of their enabling statute. *See Grayson, supra; Higgins, supra; Rietze, supra; Hamilton, supra.* The statutes under which those regulations were enacted specifically provided for the safety of citizens. Therefore, the safety regulations violated in those cases were consistent with their enabling statutes and were not an unwarranted extension or expansion thereof. Historically, it has been only in this specific context of public safety regulations that the Court has allowed KRS 446.070 to extend to violations of administrative regulations.

In the instant matter, however, the express purpose of the college licensing statute cannot be interpreted as requiring due process in a private school's disciplinary actions. Rather, the express Declaration of Intent for KRS 164.945–164.947 is:

> To promote and to enhance the opportunity for higher education in Kentucky by giving recognition and approval to bona fide colleges and universities as a protection to such bona fide institutions and as a protection to the citizens of the Commonwealth against those agencies and institutions of whatever name or organization which resort to fraudulent practices, unfair competition, or substandard education programs.

The main purpose of KRS 164.945–164.947 is to bolster the name and recognition of the Commonwealth's institutions of higher learning while protecting the Commonwealth's citizens from fraudulent or substandard educational institutions. The statute does not provide for or require any due process requirements within the disciplinary proceedings of such institutions. Therefore, the regulations adopted pursuant to KRS 164.945–164.947, purportedly imposing due process rights on private colleges, are unwarranted extensions of their enabling act. Accordingly, they do not authorize recovery under KRS 446.070 because they are not consistent with their enabling legislation as required by *Hamilton, supra.*

## II. CENTRE COLLEGE, AS A PRIVATE INSTITUTION, IS NOT REQUIRED TO AFFORD TRZOP THE SAME DUE PROCESS AS IF IT WERE A PUBLIC SCHOOL OR ANY OTHER "STATE ACTOR."

■ Centre College is a private institution of higher learning. As such, it is not constrained to the same rules and standards as public schools or institutions. Historically, Kentucky courts have been reluctant to restrain the rights of private colleges to discipline, regulate, or impose restrictions upon their students. *See Kentucky Military Inst. v. Bramblet,* 158 Ky. 205, 164 S.W. 808, 809–810 (1914); *Gott v. Berea College,* 156 Ky. 376, 161 S.W. 204, 206 (1913); *Lexington Theological Seminary v. Vance,* Ky.App., 596 S.W.2d 11 (1979).

■ In addition, the United States Supreme Court has made clear that "a school is an academic institution, not a courtroom or administrative hearing room" and due process is a flexible concept therein. *Board of Curators of Univ. of Mo. v. Horowitz,* 435 U.S. 78, 89, 98 S.Ct. 948, 55 L.Ed.2d 124 (1978). Furthermore, even when a private college specifically agrees to provide due process, it does not necessarily subject itself to the entire panoply of due process requirements that would be applicable at a state-sponsored education institution. *Jansen v. Emory Univ.,* 440 F.Supp. 1060, 1062 (N.D.Ga.1977), *aff'd.,* 579 F.2d 45 (5th Cir.1978). *See also, Henson v. Honor Comm. of Univ. of Va.,* 719 F.2d 69, 74 (4th Cir.1983); *Life Chiroprac-*

*tic College, Inc. v. Fuchs,* 176 Ga.App. 606, 337 S.E.2d 45, 48 (1985).

### III. CENTRE DID NOT VIOLATE ITS CONTRACT WITH TRZOP FOR FAILURE TO PROVIDE HIM DUE PROCESS.

 The relationship between a private college and its students can be characterized as contractual in nature. Therefore, students who are disciplined are entitled only to those procedural safeguards which the school specifically agrees to provide. *Psi Upsilon v. University of Pa.,* 404 Pa.Super. 604, 591 A.2d 755, 758 (1991), (*quoting Boehm v. University of Pa. School of Veterinary Medicine,* 392 Pa.Super. 502, 573 A.2d 575 (1990)). *See also Holert v. University of Chicago,* 751 F.Supp. 1294, 1301 (N.D.ILL.1990). Indeed, both the trial court and the Court of Appeals agreed in this case that a contract existed between Centre College and Trzop. "Of course, the fact that the college is contractually obligated to provide the procedural safeguards merely begs the question of what has been promised." *Fellheimer v. Middlebury College,* 869 F.Supp. 238, 243 (D.Vt.1994).

In its "contract" with Trzop, Centre never guaranteed the right to due process. In fact, the Centre Student Handbook clearly states that such process may be withheld in certain circumstances:

> Although students are ordinarily disciplined through the judicial process involving the Student Judiciary or the executive committees of the Intrafraternity Council or the Panhellenic Association, the college administration may invoke sanctions including dismissal from the College in unusual circumstances. The need for confidentiality, for immediate action, or for protection of others might prompt such action.

The Centre Catalog similarly provides that "the college reserves the right to exclude at any time students whose conduct or influence it regards as undesirable. No further reason need be assigned."

 A contract between an educational institution and a student is only enforceable so long as the student complies with the college's rules and regulations. *Lexington Theological Seminary, supra,* at 14. Therefore, even if Centre had guaranteed Trzop's due process, such was rendered unenforceable after Trzop failed to comply with Centre's rules. When Trzop intentionally possessed a knife in violation of Centre's express prohibition, he breached his contract with Centre and therefore excused any further performance on the college's behalf.

 Further, there is no absolute right to due process in a private college's disciplinary action when the student admits the charges necessary to justify his punishment. In the instant case, Trzop acknowledged ownership of the survival knife. This admitted violation of the applicable Student Handbook and Catalog justified his immediate dismissal from the college. In fact, where a student admits the charges against him there is no need to conduct further hearings or allow the student an opportunity to explain or to present his own version of the facts. *See, Pirschel v. Sorrell,* 2 F.Supp.2d 930, 936 (E.D.Ky.1998); *Stone v. Cornell Univ.,* 126 A.D.2d 816, 510 N.Y.S.2d 313 (1987) (no right to a hearing where student admitted possession of drugs and alcohol which were "grounds for immediate dismissal" under Code of Conduct).

Accordingly, we find that the trial court's order granting summary judgment in favor of Centre College was proper as there were no genuine issues of material fact and Centre College was entitled to

judgment as a matter of law. *Steelvest v. Scansteel Service Center,* Ky., 807 S.W.2d 476 (1991). As such, we reverse the decision of the Court of Appeals and reinstate the judgment of the Boyle Circuit Court.

LAMBERT, C.J., COOPER, JOHNSTONE, and WINTERSHEIMER, J.J. concur.

STUMBO, J., dissents in a separate opinion in which KELLER, J., joins.

STUMBO, Justice Dissenting.

Respectfully, I must dissent. The majority opinion skims over important facts and ignores relevant legal analyses that are vital to the resolution of this case.

First the facts: Appellant, a member of the National Guard, enrolled in Centre College. He had permission from the College to continue with his guard service. Appellant became involved in campus activities and was active in efforts to improve student conditions. There is testimony in the record that some members of the administration had challenged his efforts and even went so far as to suggest that he transfer to another college if he didn't cease his activities. In the spring semester of Trzop's junior year, the girlfriend of an acquaintance of Trzop informed her that Trzop had made threats of physical violence against her boyfriend. The student claimed that she was afraid for her boyfriend's safety because she was told that he had a knife.

Following this complaint, Centre personnel contacted a local police officer to seek advice from law enforcement. The record reflects that Danville City police required the complaining witness to come in and make a formal complaint before they would investigate and that no complaint was filed. Centre personnel decided to perform their own search of Trzop's room. The record reveals that before contact by

college officials was made with Trzop or the search was performed, a letter was prepared that when signed, would formally dismiss Trzop from the college. Without giving notice to Trzop or his roommate, their room was searched and three pocketknives and a military issue knife were found. Trzop testified that the military knife was part of his National Guard equipment and that he had to store it on campus in the event he was called for duty. Other testimony from college officials indicate that they did not feel it necessary to either supervise Trzop or warn other students about him during the two days between notification of the alleged threat and the dismissal of Trzop. Centre then required Trzop to meet with various administrative personnel, including the acting Dean of Students and campus security officers, regarding the knife. Also present at the meeting was an employee of a mental health agency, whom Centre claims in its brief, was there "to help in assessing Trzop's mental state." Trzop was not informed that he was under a mental health examination at the time, nor did he consent to such evaluation or examination. Trzop was not given any advance warning of the meeting, but was removed from class by campus security officers, who escorted him to the meeting, and seated themselves on either side of him during the meeting. Trzop asserts that these officers prevented him from leaving the meeting.

During the meeting, Trzop denied making any threats against any other student, while admitting that the knife was his, was part of his National Guard gear and was a gift from his father, who served in the United States military. Trzop's parents were neither notified of the meeting nor present. Trzop asserts that he was given no opportunity to state his case or mount a defense to the charges during the meeting.

He was given the previously prepared letter of dismissal, and escorted to his room by the campus security personnel to collect his belongings.

Trzop was refused the right to pursue re-admission unless he agreed to psychiatric treatment and evaluation as specified by Centre, rather than as determined necessary by any trained mental health professional. Additionally, Centre required that Trzop's "attitude" change prior to any request for re-admission.

Trzop's suit in Circuit Court claims that his due process rights were violated by Centre by the failure to receive any notice of the pre-dismissal meeting, given no opportunity to defend himself, or to call any witnesses on his behalf. Neither the student who allegedly heard the threat, nor the student who was allegedly the object of the threat, were contacted regarding the veracity of the charges. He further alleged that he was not provided with a reason for his dismissal at the time it took place and that in later communications with the College the reason varied. In response to discovery requests, Centre asserted that the dismissal was "because he was believed to be a threat to himself and others." In contradiction to this assertion, many of the witnesses deposed stated that Trzop denied being a threat to others and that he showed no sign of being a threat to himself. Centre also claimed in its Reply in Support of Summary Judgment, that Trzop was "provided with the fundamentals of due process-notice and opportunity to be heard-at the time of his dismissal and afterwards" and that the law requires no more.

The trial court's grant of summary judgment was founded upon the finding that there is no statutory requirement that a private college, such as Centre College, has to provide any due process to students, and that the student handbook does not impose any such duty. Finding that the student handbook prohibits possession of any dangerous weapon and that Trzop admitted having the knife, dismissal was warranted.

It is my opinion that this dismissal was completely erroneous. As a private college, Centre is subject to being and remaining licensed as a nonpublic entity for higher learning by the Kentucky Council on Higher Education. The General Assembly charged the Council with the responsibility with such licensing in KRS 164.945 *et seq.* The Council had promulgated various administrative regulations to facilitate the licensing process for nonpublic colleges. One such regulation is 13 KAR 1:020 Section 7(11)(h), which states in pertinent part that "[t]he college shall establish suitable policies and procedures whereby a student is assured due process." The majority opinion holds that this regulation is neither an unwarranted extension of the enabling act, stating that it promotes neither the name nor recognition of the Commonwealth's institutions of higher learning, nor protects the Commonwealth's citizens from fraudulent or substandard educational institutions. In my view, both goals will truly be advanced by the simple recognition of the fact that when a student is accused of misconduct in a Kentucky institution of learning, he or she will be given notice of the complaint, the right to present a defense to the charge and the right to confront witnesses. While the Student Catalog provides for sanctions, including dismissal from the College in unusual circumstances outside the standard Student Judiciary, nowhere does it state that those sanctions may be imposed without the right to simple due process.

I take no comfort in the fact that Trzop admitted the knife at issue was in his possession, thereby confessing to a violation of the student code. There is a clear

question of fact as to whether Trzop's membership in the National Guard was taken into account by the Acting Dean of Students during the confrontation on the day he was dismissed. The Dean later testified that he did not know that Trzop belonged to the organization while Trzop testified that Centre not only knew of his membership but also had specifically granted him permission to attend training. Further, the Dean testified that he had no interest in sorting out the truth of the third party complaints about Trzop; rather, his primary interest was to ensure that the student be removed from campus. The ultimate penalty of dismissal from an educational institution is surely one that should be imposed after the most careful of reflection and after all other possible sanctions have been considered. It appears from this record, when viewed in a light most favorable to the plaintiff, that there was no consideration of any other sanction. Indeed there seems to have been little consideration of the entire situation. Preparing a letter of dismissal before the search was conducted or the student questioned can count as due process by no one's definition, it can only be considered an arbitrary act.

I would affirm the Court of Appeals and remand this case to the Boyle Circuit Court for a trial on the merits.

KELLER, J., joins this dissent.