RENDERED: JUNE 15, 2023
TO BE PUBLISHED

# Supreme Court of Kentucky

## 2022-SC-0129-DG

UNIVERSITY OF KENTUCKY                                                                    APPELLANT

V.                          ON REVIEW FROM COURT OF APPEALS
                                     NO. 2021-CA-0020
                         FRANKLIN CIRCUIT COURT NO. 20-CI-00648

PETER REGARD; LEAH OUSLEY; HALEIGH                                          APPELLEES
ALEXANDRA LONG; MERIDETH MULLIN;
ANNA QUINN CURRAN; MACKENZIE
PUTTEET; AND KEEGAN MCLARNEY

**OPINION OF THE COURT BY JUSTICE CONLEY**

**<u>AFFIRMING</u>**

This case is before the Court upon the trial court's denial of the

University of Kentucky's (the University) claim of governmental immunity. The

Court of Appeals affirmed the denial. The University filed a motion for

discretionary review, and we granted to determine whether the Student

Financial Obligation (SFO) and accompanying documents are in fact a written

contract per KRS[1] 45A.245(1) such that governmental immunity has been

waived and the underlying breach of contract claim of the Students[2] may

proceed. Although initially under the impression that the Students' only

---

[1] Kentucky Revised Statutes.
[2] We refer to the Appellees collectively as Students.

remaining portion of its breach of contract claim pertained to mandatory fees, both parties at oral argument represented that the trial court's dismissal of the Students' claim pertaining to tuition is subject to a motion to reconsider, and requested this Court consider tuition in its analysis.

The record reveals the trial court did make a ruling on governmental immunity for the breach of contract claim for both tuition and fees, and the Court of Appeals did as well. Although the trial court also dismissed the breach of contract claim on the merits insofar as it encompassed tuition, because the finality of that portion of the trial court's judgment is not yet achieved, we believe our jurisdiction to consider the governmental immunity for both tuition and fees is satisfied. *Breathitt Cty. Bd. of Ed. v. Prater*, 292 S.W.3d 883, 887 (Ky. 2009). We emphasize, however, that our jurisdiction at this stage of the proceedings is strictly limited to the issue of governmental immunity. *Id.* Consequently, we express no opinion whatsoever on the merits of the underlying claim. For the following reasons, we affirm the Court of Appeals.

### I.      Facts and Procedural Posture

In January of 2020, the University of Kentucky began its annual spring semester, which was set to conclude in May 2020. The Students were all enrolled as full-time, on-campus students. In late February of that same year, the world gradually became aware of the Covid-19 virus, which more or less enveloped the entire globe by March. The history of the pandemic certainly needs no detailed historical overview. Reaction to the pandemic by governments was varied, but private entities as well, either by compulsion of

2

law or voluntarily, also instituted various measures in an effort to combat spread of the virus. As part of this voluntary effort, the University, on March 23, 2020, switched all on-campus classes to an on-line format for the remainder of the Spring semester. The Students also allege in their complaint that "the campus was effectively shut down for student use and access."

The University did not make any disbursements to the Students refunding tuition or mandatory fees as a result of its action.[3] On August 7, 2020, the Students filed their putative class action suit against the University for breach of contract regarding tuition and fees for the Spring 2020 semester. On August 24, 2020, the Students amended their complaint per CR[4] 15.01, attaching numerous documents they allege "taken as a whole, constitute the written contract for on-campus instruction and use of facilities and other benefits related to mandatory fees . . . ." The University filed a motion to dismiss, asserting that the documents submitted by the Students do not constitute a written agreement therefore, the University is shielded by governmental immunity. Alternatively, the University argued the Students had failed to state a claim upon which relief could be granted because they could not demonstrate a breach of any promise made by the University.

The trial court ruled on the issue of governmental immunity that there was a written contract within the scope of KRS 45A.245(1) because of the SFO,

---

[3] Notably, however, the University did concede at oral argument that it did refund monies related to housing and dining, although stating those involved separate contracts with third-party vendors and are not at issue before the Court.

[4] Kentucky Civil Rules of Procedure.

and that the other documents submitted by the Students "reinforce[s] the terms of that contract and the expectations of the parties . . . ." Thus, the breach of contract claim is not barred by governmental immunity. It further ruled that the breach of contract claim is not barred by governmental immunity because the Students were seeking refunds of money paid to the University, and not money from the state treasury. The trial court dismissed the Students' claim for unjust enrichment because governmental immunity has not been waived for unjust enrichment claims. Finally, it also dismissed the Students' breach of contract claim pertaining to tuition—holding the Students still received instruction, grades, and academic credits despite the shift to an on-line format.

The SFO was presented to the Students in an on-line format via a registration portal. They were required to agree to the SFO before proceeding with registration. In pertinent part, the SFO states

> Please read the following statement and then click the accept button at the bottom of this page to continue the registration process.
>
> ...
>
> *Request and completion of registration constitutes a contractual financial obligation to pay tuition and fees for which I am liable.* I am responsible for reading and understanding the current Drop/Refund policy of the University as it appears in the current Schedule of Classes. Permission to cancel enrollment does not constitute, nor shall it be construed as, a waiver by the University of my financial obligation. I understand that any financial assistance I receive will be applied against my billed charges to reduce my financial obligation.

(Emphasis added).

4

The University Bulletin (the Bulletin) was also provided to the Students during the registration process. The Bulletin sets out, in pertinent part, the tuition and mandatory fee rates. These rates vary according to a student's status as full-time or part-time student; whether they are an undergraduate, graduate, or a professional school student; the program enrolled in; whether they live on-campus or off-campus; and whether they are attending at least one class on-campus as opposed to taking only on-line classes. Undergraduate, full-time, resident students were charged $6,180.00 per semester. The on-line learning rate fee for students with at least one on-campus course were charged $601.00 per credit hour. Students with no on-campus courses were charged an online learning rate per credit hour of $570.00. Footnote 2 to the Bulletin states "Unless stated otherwise, the full-time per semester rates will be charged to undergraduate students enrolled for 12 credit hours or more . . . ."

Footnote 3 to the Bulletin states, "Mandatory fees are listed separately above and will be assessed based on the student's full-time or part-time status, course delivery mode(s), and whether or not the student is enrolled in at least one on-campus course." The "Summary of Mandatory Fees Assessed by Student Classification" in the Bulletin states undergraduates that are full-time with at least one course on-campus were charged $674.50. Full time undergraduates with no on-campus courses were charged $128.50. A total of eighteen different products or services are listed pertaining to what the mandatory fee is going towards. The exact breakdown of costs is not pertinent here, but we highlight some of the more notable products and services

including: the Student Government Association; Technology; Johnson Center; Student Center; Student Center Renovation; Student Services; Transportation; Student Health Fee; and Student Wellness.

The Bulletin defines an on-campus course as "requires regular or periodic physical attendance on campus for instruction and/or assessment." It notes, however, that the "delivery modes for an on-campus course may include, but are not limited to, traditional classroom, hybrid (e.g., traditional classroom and Internet, web-based), compressed video or satellite courses." An on-line course is defined as "Internet, web-based delivery mode[,]" in Footnote 4.

The University appealed the ruling of the trial court as to governmental immunity. The Court of Appeals affirmed the ruling that the Students had a written contract with the University thus, governmental immunity had been waived. The Court of Appeals reversed the trial court's ruling that governmental immunity was not applicable because the students were only seeking a refund of money from the University, rather than from the state treasury. The Students have not appealed this ruling and we will not consider it further. Finally, the Court of Appeals made clear its ruling only pertained to governmental immunity so the trial court's dismissal of the breach of contract claim as to tuition on the merits was not within its jurisdiction.

Two key passages of the Court of Appeals' opinion are worth highlighting. First, the Court of Appeals ruled

> The University's Financial Obligation Statement is best described as a "clickwrap" arrangement, in which the user is required to "explicitly assent by clicking 'I agree' (or something similar) before using the website or purchasing a product." *Foster v. Walmart, Inc.,*

6

15 F.4th 860, 863 (8th Cir. 2021). "Applying ordinary contract law principles, courts routinely uphold 'clickwrap' ... agreements ... 'for the principal reason that the user has affirmatively assented to the terms of agreement by clicking "I agree." ' " *Hidalgo v. Amateur Athletic Union of United States, Inc.*, 468 F. Supp. 3d 646, 654 (S.D.N.Y. 2020) (quoting *Meyer v. Uber Techs., Inc.*, 868 F.3d 66, 75 (2d Cir. 2017)).

Applying this rule, as well as KRS 369.107(3),[5] the Court of Appeals held "the parties manifested their mutual assent to be bound through their electronic interchanges with one another." Applying the doctrine of incorporation by reference, the Court of Appeals concluded

> When the Financial Obligation Statement is considered in conjunction with the other registration documents, all the elements necessary for contract formation are met. When boiled down to its simplest terms, through these written documents, the students and the University agreed to enter into a contractual relationship whereby the students agreed to pay the University fees and tuition in accordance with the University's fee and tuition schedule as set out in the University Bulletin. In return, the University agreed to provide the students with access to the classes selected during registration and to make its facilities available for the students' use. The terms are both "definite and certain" and set forth the "promises of performance to be rendered by each party." *Energy Home, Div. of Southern Energy Homes, Inc.*, 406 S.W.3d [828 (Ky. 2013)] at 834 (citation omitted). Accordingly, we agree with the circuit court that Appellees and the University have a written contract with each other for the payment of fees and tuition for the Spring Semester, and that Appellees' breach of contract claim as set forth in their first amended complaint is "an action against the University on the contract" allowing this suit to proceed despite the University's governmental immunity. KRS 45A.245.

(Internal footnotes omitted).

---

[5] "If a law requires a record to be in writing, an electronic record satisfies the law."

The University has not argued the Court of Appeals erred in its holding as to the nature of the contract as a "click-wrap" agreement or that there was mutual assent. The University filed a motion for discretionary review in this Court which we granted, solely to consider whether governmental immunity bars the Students' breach of contract claim. We now address that question below.

## II.      Standard of Review and Rules of Controlling Law

Our review is *de novo*. A denial of a claim of governmental immunity is subject to interlocutory appeal, and whether a party is entitled to governmental immunity is a question of law. *Britt v. University of Louisville*, 628 S.W.3d 1, 4-5 (Ky. 2021). The formation and interpretation of contracts are also questions of law. *Id.* at 5. Likewise, an order of dismissal for failure to state a claim upon which relief can be granted is a question of law. *Fox v. Grayson*, 317 S.W.3d 1, 7 (Ky. 2010). Importantly, a motion to dismiss "admits as true the material facts of the complaint." *Id.* (quoting *Upchurch v. Clinton Cnty.*, 330 S.W.2d 428, 429–30 (Ky. 1959)). Therefore, on our review, we must accept the allegations of the students as true and liberally construe their pleadings in a light most favorable to them. *Id.*

A state university of the Commonwealth is a governmental body and entitled to governmental immunity unless waived by the General Assembly. *Britt*, 628 S.W.3d at 5. The General Assembly has passed a general, unqualified waiver of immunity for all written contracts, to wit:

8

Any person, firm or corporation, having a lawfully authorized written contract with the Commonwealth at the time of or after June 21, 1974, may bring an action against the Commonwealth on the contract, including but not limited to actions either for breach of contracts or for enforcement of contracts or for both. Any such action shall be brought in the Franklin Circuit Court and shall be tried by the court sitting without a jury. All defenses in law or equity, except the defense of governmental immunity, shall be preserved to the Commonwealth.

KRS 45A.245(1); *Univ. of Louisville v. Rothstein*, 532 S.W.3d 644, 647 (Ky. 2017).

The essential elements of a valid contract are an offer and unequivocal acceptance, a certain and complete recitation of the material terms, and consideration. Under Kentucky law, the terms of the contract must be sufficiently definite to enable the court to determine the measure of damages in the event of breach.

*Britt*, 628 S.W.3d at 5 (internal footnotes and citations omitted). Moreover, "[a]ll contracts made with the state are subject to the provisions of the existing law[.]" *Armory Com'n v. Palmer*, 69 S.W.2d 681, 682 (Ky. 1934). In other words, the same rules of contract formation and interpretation apply to contracts with the Commonwealth as they do to contracts between private individuals or entities. *See also Lynch v. United States*, 292 U.S. 571, 579 (1934) (holding "[w]hen the United States enters into contract relations, its rights and duties therein are governed generally by the law applicable to contracts between private individuals.").

It is black letter law that multiple documents, each individually incomplete, may form a contract, when combined and read as one to provide the necessary elements of contract formation. *Sackett v. Maggard*, 134 S.W. 888, 890 (Ky. 1911) ("It is well settled that, where a contract is contained in

9

two separate and distinct papers, they will be read together for the purpose of ascertaining the true contract."). At common law, one writing can refer to another writing and incorporate the latter's contents into the contractual bargain; this is known as incorporation by reference. *Dixon v. Daymar Colleges Group, LLC*, 483 S.W.3d 332, 344 (Ky. 2015). "For a contract validly to incorporate other terms, 'it must be clear that the parties to the agreement had knowledge of and assented to the incorporated terms.' In addition, there must be 'clear language expressing the incorporation of other terms and conditions.'" *Id.* (internal footnotes and citations omitted); *Britt*, 628 S.W.3d at 8. "Terms and conditions incorporated by reference are enforceable." *Home Lumber Co. v. Appalachian Reg'l Hosps., Inc.*, 722 S.W.2d 912, 914 (Ky. App. 1987).

In *Baumann Paper Co., Inc. v. Holland*, this Court cited as authority the Restatement of Contracts (Second) § 132, which elucidates the general rule of incorporation by reference. 554 S.W.3d 845, 849 (Ky. 2018). Although that case dealt with the incorporation by reference for purposes of the Statute of Frauds, its endorsement of the Restatement is relevant here. *See also Lonnie Hayes & Sons Staves, Inc. v. Bourbon Cooperage Co.*, 777 S.W.2d 940, 942 (Ky. App. 1989) (applying the Restatement of Contracts (Second) § 132 in a Statute of Frauds context).[6] The Restatement states contracts "may consist of several

---

[6] The dissent seems to suggest that because the Restatement of Contracts (Second) § 132 discussing the doctrine of incorporation by reference occurs within the general discussion of the Statute of Frauds, that section is not applicable to this case. We cannot help the editorial preferences of the authors of the Restatement. Suffice to say, there is no doubt the doctrine of incorporation by reference is a general common law doctrine, and applies outside the Statute of Frauds context. Because both KRS

10

writings if one of the writings is signed and the writings in the circumstances clearly indicate that they relate to the same transaction." Restatement of Contracts (Second) § 132. In comment *c*, it is explained that

> It is sufficient that the signed writing refers to the unsigned writing explicitly *or by implication*, or that *the party to be charged physically attaches one document to the other* or encloses them in the same envelope. Even if there is *no internal reference or physical connection*, the documents may be read together if *in the circumstances they clearly relate to the same transaction and the party to be charged has acquiesced in the contents of the unsigned writing.*

*Id.* (emphasis added).

Confusion has arisen in this case as to what this Court has meant by "clear language expressing the incorporation of other terms and conditions[,]" as a necessary element of incorporation by reference. *Dixon*, 483 S.W.3d at 344. While the factual circumstances and legal arguments of prior cases have not brought this issue to the fore, here the University believes this requirement specifically means clear language *of incorporation*—that the incorporated document shall control or decide the relation of the parties to the contract. To the contrary, what the law demands is a clear reference to the document *being incorporated*.

> As long as the contract makes clear reference to the document and describes it in such terms *that its identity may be ascertained beyond doubt*, the parties to a contract
> may incorporate contractual terms by reference to a
> separate, noncontemporaneous document, including a separate

---

45A.245(1) and KRS 371.010 share a common requirement that a contract be written, we are satisfied that § 132 is illustrative of the general rule.

11

agreement to which they are not parties, and including a separate document which is unsigned.

11 Williston on Contracts § 30:25 (4th ed.) (emphasis added); *see also Dixon*, 438 S.W.3d at 344 nn.38-40 (quoting Williston, *supra*). As the Restatement demonstrates though, this "clear reference" can be entirely circumstantial, without internal linguistic reference or even physical connection between the documents, so long as the documents clearly pertain to the same subject and the party to be charged has acquiesced to the contents of the unsigned, incorporated document.

Application of the rule as described by the Restatement is not a significant doctrinal evolution in Kentucky law. Unfortunately, there is a dearth of precedent explaining the doctrine of incorporation by reference for contracts in detail. What little that does exist, however, goes back as far as 1812, just twenty years after the creation of Kentucky as an independent state in 1792. These early cases demonstrate that our rule of incorporation by reference has never been so formulaic as now advocated by the University.

In the earliest case[7] we can find, *McDowell v. Hall*, a bill of sale and article of agreement were read as one contract because the documents were "executed at the same time, with reference to each other, and in relation to the

---

[7] The further we go back in time we reach a point when chattel slavery existed and often formed the nucleus of controversies that the courts were called upon to adjudicate. We cannot change that fact and must accept history as it is handed down to us. Citations to such cases should in no way be seen as approval of the institution of slavery and, obviously, such cases are overruled insofar as they contravene the 13th amendment of the federal Constitution. We cite these cases only for extrapolation of the rule of incorporation by reference in the Commonwealth, a rule that is otherwise unconnected to and independent of the institution of slavery.

same subject, and form essential parts of one entire agreement." 5 Ky. 610, 611 (Ky. 1812). But the only language cited by the court evincing incorporation was the language of the article of agreement which referred to "a bill of sale now given . . ." *Id.* Such language on its face is not language of incorporation; it does not say the bill of sale will control or decide the relationship of the parties. Instead, it is simply a reference to another document in existence. Nevertheless, the court looked to the surrounding circumstances—execution at the same time and mutuality of the subject matter—to find the documents to be one contract. *Id.* In *Dillingham v. Estill*, the rule was stated,

> One writing can not be connected with another unless it refer to it. But where there are words of reference to the subject matter . . . *though there be no description of the writing referred to*, it is sufficient[,] and proof aliundi (consistent with the writings) may be used to show that they were both simultaneously executed, and are part of the same contract.

33 Ky. 21, 22 (Ky. 1835) (emphasis added). In *Dillingham*, a bill of sale with warranty was executed by the parties for that which was purchased, but one party simultaneously delivered a writing stating he would not be responsible for the things sold. *Id.* at 23. That language essentially defeated the warranty in the bill of sale. *Id.* Despite that, the court found that even though neither the bill of sale nor latter writing contained any reference to one another, because they related to the same subject matter and were delivered simultaneously, they constituted one contract. *Id.*

The above cases refer to "executed" documents, which likely means all the documents were signed by the parties. *Executed, Black's Law Dictionary*

13

(11th ed. 2019). But our decision in *Britt* approved of incorporation by reference to an unsigned document. 628 S.W.3d at 8. With equal clarity, the Restatement and Williston, as cited above, both demonstrate that not all documents need be signed for incorporation to be found. *McDowell* and *Dillingham* show that the common law in Kentucky has never required clear and unequivocal language *of incorporation*—that an incorporated document will control or decide the relationship of the parties. Instead, mutuality of subject matter, and surrounding circumstances not inconsistent with the writings, is sufficient so long as the document to be incorporated is not in doubt.

*Britt*'s holding fits within the framework of this rule, both historically and as currently applied. Nothing in *Britt* supports the notion that this Court has departed from two centuries of common law precedent, nor did we add an additional element to the common law rule. In *Britt*, the Appellant had been sent a letter offering her a position at the University of Louisville. That letter's offer included the material terms of the duration of the position and salary. 628 S.W.3d at 3. It "further stated other terms and conditions applicable to the appointment, such as the policies governing personnel reviews and termination, were set out in the University's governance document, The *Redbook*, and other relevant college-level policy statements." *Id.* From 2006-09, she received "substantially identical" letters of employment annually, each one stating "the terms and conditions of employment in the University of Louisville herein specified include all rules and regulations promulgated on the authority of the University of Louisville Board of Trustees and the governance

14

document known as The *Redbook.*" *Id.* Significantly, none of the three continuation letters contained the terms of salary or tasks she was to perform. *Id.* at 7. But because the original employment letter did contain those terms, and Britt had been employed for several years, we held "the parties intended for Dr. Britt to perform substantially similar tasks for the same compensation due under her prior appointment. A reviewing court could determine if breach occurred, and if so, the measure of damages, *by reference to the parties' prior performance.*" *Id.* at 7 (emphasis added). In other words, by reference to surrounding circumstances, despite the fact that none of the continuation letters specifically referenced or incorporated the original employment letter, the material terms were definite and enforceable as a written contract.

As to The Redbook, we held "the University, in its written agreements, has stated that The *Redbook* shall control, decide, or affect its relationship with Dr. Britt. As a result, we find the provisions of The *Redbook* . . . to be validly incorporated into each of the foregoing contracts." *Id.* at 8. The University has seized on the "control, decide, or affect" language to argue that absent such language there can be no incorporation by reference. As we have demonstrated above, that is simply not the law under any rational reading of Kentucky precedent, the Restatement, or Williston. *Britt* merely held that such language was specific enough to find incorporation, contrary to the ruling of the Court of Appeals. *Id.* We did not intend thereby to reverse two centuries of precedent or depart from the Restatement by so holding.

15

Moreover, to read *Britt* as requiring explicit language in one document that another document shall "control, decide, or affect", or similar language, the relationship of the parties would render *Britt* internally contradictory. How could we have found that the continuation letters of employment, which did not state the material term of salary, were nonetheless a written contract for purpose of KRS 45A.245(1), when they did not have any language to the effect that the original employment letter's salary term would "control, decide, or affect" the on-going employment relation between Britt and the University of Louisville? To ask the question is to answer it. *Britt* does not require in all cases for incorporation by reference to apply that there be language that the incorporated document will "control, decide, affect" the parties' relationship because *Britt* did not even apply that standard in its own analysis. Instead, we held the language of the latter three employment letters "that the University intends to *continue* Dr. Britt's employment . . ." was sufficient to determine "the parties intended for Dr. Britt to perform substantially similar tasks for the same compensation due under her prior appointment." *Id.* at 7. And because the salary term had been written in the original letter of employment, the requirement that the terms be definite and in writing was satisfied; thus, we held Britt had "executed valid written contracts[,]" and governmental immunity had been waived. *Id.*

The dissent's reading of *Britt* does not ultimately contradict what we just stated. We are one in agreeing that *Britt* held reference to the prior performance of the parties was a legitimate way to calculate damages. *Id.* The dissent

16

believes, however, the fact that the continuation letters did not mention either the material term of salary or the original employment letter has no relevance to the doctrine of incorporation by reference. Nor indeed does the dissent address how the lack of recitation of a material term—which salary obviously is in a breach of contract claim against an employer by its employee—has no bearing on what is necessary for a material term to be written per KRS 45A.245(1).[8] The dissent agrees in Footnote 3 that "stating that a prior contractual relationship will 'continue' is sufficiently clear language to refer to and actually incorporate that contract [the original employment letter] into a subsequent agreement." That is what we just explained in the above paragraph. But how does the dissent square its own footnote with its other statement, that "nowhere in the *Britt* opinion did the Court even consider, much less suggest or hold, that the subsequent letters incorporated the initial letter." *Infra*, at 7. This is illogical. Thus, the dissent has inadvertently agreed with us—the doctrine of incorporation by reference is necessary to understand *Britt.*

If we were to insist that the doctrine has no relevance to the validity of the continuation contracts under KRS 45A.245(1), then *Britt* is transformed into a much broader rule than anyone on the Court now suggests: that a

---

[8] "The measure of damages for breach of contract is 'that sum which will put the injured party into the same position he would have been in had the contract been performed'". *Hogan v. Long*, 922 S.W.3d 368, 371 (Ky. 1995) (quoting *Perkins Motors, Inc. v. Autotruck Fed. Credit Union,* 607 S.W.2d 429, 430 (Ky. App. 1980)). Salary is the *sine qua non* of making that determination in the employment context such as *Britt.*

17

material term regarding the value of the contracts could be supplied by reference to prior performance. How would that not be a material term implied in fact? It obviously would be. The dissent then is in a Catch-22; either *Britt*'s ruling that the continuation letters constituted valid, written contracts must be understood within the context of the doctrine of incorporation by reference or *Britt* must be understood as implying in fact a material term. No one on this Court agrees with the latter proposition. Therefore, the dissent is compelled to agree with us in a footnote lest it collapse under the weight of its own contradiction.

### III.    Analysis

The University presents three separate arguments, but the latter two are closely intertwined. First, the University argues that the only contract it has with the Students (and all its students generally) is a "contract for registration." In other words, in exchange for a promise of payment of thousands of dollars in tuition and hundreds of dollars in mandatory fees on the part of the student, the University obligates itself to do nothing more than provide that student with the opportunity to register or enroll for classes. Beyond that, the University argues it has no written contractual obligation to the students.

To use a colloquial phrase, that dog just won't hunt. We reject the interpretation advanced by the University that it has nothing more than a contract for an opportunity to register. Such a position is illogical. Instead, it is clear the Students and the University entered into a written contract offered by the University, to receive a collegiate-level education in exchange for the

payment of an applicable tuition, based on the registered classes, at a rate determined by the University; and to the use of ancillary services offered by the University such as (but not limited to) health services and recreational facilities in exchange for the mandatory fees.

The University next argues that even if it does have a contractual obligation beyond merely providing an opportunity for registration, such obligation is not written in any of the documents provided by the Students, specifically the SFO and Bulletin. It claims that because there are no express provisions in those documents obligating the University to provide in-class instruction or access to other ancillary services, any contractual obligation the University might have to provide those things are at best implied, thus, there is no written contract and governmental immunity has not been waived. Additionally, because obligations to provide those services are not written, the Students' claims are not brought "on the contract" therefore, governmental immunity has not been waived. Finally, the University argues, because the SFO does not contain the terms of the applicable tuition and fees rate, the Bulletin must be clearly incorporated by the SFO to be a part of the contract, which the University asserts is not the case.

Once again, the University is arguing a much too narrow understanding of its own contract. By offering students to enter into a contractual agreement to pay tuition and fees in the SFO and then identifying what those tuition and fees would be in the Bulletin—based on whether the students were registering for on-campus class instruction or on-line classes, as well as differing fee rates

19

for students taking or not taking on-campus courses—the University could not have but understood that definite, unambiguous material terms existed in writing that it was contractually bound to adhere to once the offer was accepted. "A promise is an express undertaking or agreement to carry the purpose into effect . . . It is a declaration which gives to the person to whom made a right to expect or claim the performance of some particular thing." *Hoskins v. Black*, 226 S.W. 384, 385 (Ky. 1920). The purposes to be carried into effect, the things to be performed, were delineated by the University in the Bulletin. Specifically, the University defined on-campus and on-line classes differently. The former requires "regular or periodic physical attendance on campus for instruction and/or assessment." The latter is exclusively "Internet, web-based." It then charged differing rates of tuition per credit hour for these classes based on whether the students were registered only for on-line classes or had at least one on-campus course. The same applies to on-campus or off-campus students, who were charged substantially different mandatory fees based on that distinction, and the University clearly identified eighteen different services to which those fees would be applied.

The fact that the SFO does not expressly mention, point to, or adopt the Bulletin insofar as the Bulletin contains the requisite tuition and fee rates is not dispositive under Kentucky law. "[W]here there are words of reference to the subject matter . . . *though there be no description of the writing referred to*, it is sufficient[.]" *Dillingham*, 33 Ky. at 22 (emphasis added). The SFO clearly mentioned tuition and fees and the Bulletin clearly set out the differing rates of

20

tuition and fees, required to determine the dollar amount of the financial obligation the Students had agreed to per the clickwrap agreement in the SFO. Thus, there is mutuality of subject matter. Moreover, the University has not submitted any other document purporting to set *different* tuition and fee rates than those identified in the Bulletin for the Spring 2020 semester thus, there cannot be any doubt that the Bulletin is the appropriate document to refer to when discussing incorporation. Finally, the overwhelming implication and surrounding circumstances confirms that the Bulletin is correctly incorporated by reference. The students allege, and the University concedes, that the Bulletin was provided to them when they registered for classes online through an on-line registration portal.[9] In the digital age, this is the equivalent of physical attachment. Nor can there be any doubt that under these circumstances, the University had "knowledge of and assented to the incorporated terms[.]" *Dixon*, 483 S.W.3d at 344. The University's knowledge and assent is demonstrated by it being the author of the Bulletin and responsible for its contents. The University obviously knew the tuition and fee rates described in the Bulletin, informed the students of said rates by providing the Bulletin in the registration process, and intended those terms to apply to its contract with the students. It is absurd to suggest otherwise. Indeed, it is *only* by referencing the Bulletin that the University could determine what

---

[9] Concededly, the students were also provided numerous other documents but none purporting to contain the material terms of tuition and fee rates.

amount of tuition and fees the Students promised to pay it, per the clickwrap agreement of the SFO.

As for the contention that the University is nowhere bound by clear and explicit language to provide in-person classroom instruction, we find that argument untenable. The Bulletin sets different tuition rates for the different categories of students. Students with at least one on-campus class as a rule get a higher tuition rate than those students enrolled only on-line. The definition of an on-campus course, as the University determined, requires "regular or periodic physical attendance[.]" The University is offering two different products/services between on-campus and on-line courses, and charges two different prices accordingly. The same logic applies for mandatory fees: on-campus students are charged a higher rate than those students off-campus. We simply cannot credit the sophistic argument that by defining a product or service in writing and then charging a price for those products or services in writing, the University nonetheless has no reciprocal contractual obligation to provide said products and services as defined once the offer has been accepted.

It has been noted by the dissent that the University does not in fact set the tuition price. Per KRS 164.020(8)(a), the Council on Postsecondary Education in Kentucky was empowered to determine tuition rates.[10] As true as that is, the University was still the offeror of the contract, was the beneficiary of

---

[10] KRS 164.020(8)(a) was amended at the General Session of 2023, but that amendment is immaterial.

22

the tuition, and intended the Students to be obliged to pay the applicable tuition rates set by the Council. Nonetheless, "[i]t is a rule of general application that contracts of public bodies, like those of individuals, are made with reference to existing statutes and that statutory provisions enter into the contracts by operation of law." *Moore v. Babb*, 343 S.W.2d 373, 376 (Ky. 1960). In *Babb*, it was held that when a teacher had become eligible to be employed under a continuing service contract, "his or her subsequent employment may be only under a continuing contract, and that the Board of Education cannot enter into any other kind of contract with those teachers." *Id.* This was contrary to the one- or two-year limited term contracts that were being offered. *Id.* Thus, the statute controlled the material terms—duration of employment— the government could enter into. In *Grayson Rural Electric Corp. v. City of Vanceburg*, we held "rights accorded to parties by statute become a part of the operative facts which govern their relationships." 4 S.W.3d 526, 531 (Ky. 1999). That case held Grayson had superior rights to supply electrical utilities by statute over Vanceburg. *Id.*

Therefore, because the material term of tuition was not supplied by either party of their own volition in this case but was imposed upon them by operation of statute, the fact that the SFO did not expressly define the tuition rate is immaterial to whether a written contract exists per KRS 45A.245(1). We must proceed as if the tuition term was already and expressly incorporated into the contract. "[I]n construing a contract which rests upon statute, the statute must be read into the contract[.]" *Personal Indus. Bankers v. Citizens Budget*

23

*Co. of Dayton, OH*, 80 F.2d 327, 328 (6th Cir. 1935). We fail to see how KRS 164.020(8)(a) does not support our decision.

That being said, we are not inferring or implying any material terms by our holding. The Bulletin in plain, written English defines on-campus and on-line classes; in plain, written English it sets out the tuition rates between on-campus and on-line courses and the students knew by registering for such classes they would be charged accordingly; and in plain, written English it sets out the differing rates of mandatory fees and the students knew they would have to pay said fees according to their status as on-campus or off-campus students. The Bulletin informed the students unambiguously and in writing what they were paying for, and the students had a legitimate expectation to receive it. Thus, a reviewing court can determine if a breach occurred and the concomitant measure of damages by reference to the Bulletin. *Britt*, 628 S.W.3d at 5.

The dissent argues that we are implying material terms and, consequently, expanding the scope of KRS 45A.245(1) to include implied in fact contracts. That charge is most unwarranted. We have not expanded the General Assembly's waiver to implied contracts. We have made painfully clear that all the material terms related to tuition and fees are written down in plain English that the University of Kentucky was clearly aware of and assented to. Indeed, the dissent fails to reckon with the fact that

> The terms 'express contract' and 'contract implied in fact' indicate a difference only in the mode of proof. A contract implied in fact is implied only in that it is to be inferred from the circumstances, the

24

> conduct, acts, or relation of the parties, rather than from their
> spoken words.

*Kellum v. Browning's* Adm'r, 21 S.W.2d 459, 465 (Ky. 1929). That fact that a

contract is implied in fact does not make it any less of a contract. The General

Assembly's waiver of sovereign immunity for all written contracts then is

properly understood as a waiver for all contracts with the Commonwealth that

can be proved by writing. We have not held that *any* of the material terms—

tuition and fees—are based on circumstances, conduct, acts, or relations of the

parties with one another. We have looked to circumstances to find *incorporation*

but that is distinct from the material terms themselves. The dissent is simply

confusing concepts.

The University has cited the case of *University of Florida Board of*

*Trustees v. Rojas,* 351 So.3d. 1167 (Fl. Dist. Ct. App. 2022) for support that

sovereign immunity[11] bars the students' claims. This is a decision of an

intermediate court from a foreign jurisdiction and only persuasive authority for

this Court. We find the decision rather unpersuasive. First, the court accepted

the "contract for registration" theory that we have firmly rejected. *Id.* at 1171.

Additionally, nowhere in the majority opinion is there mentioned the doctrine of

incorporation by reference or other authority relating to that doctrine. In fact,

the only implied discussion of the doctrine of incorporation by reference came

---

[11] Kentucky law maintains a difference between sovereign and governmental immunity, but "to the extent that the agency is performing a governmental function, as a state university does, its governmental immunity is functionally the same as sovereign immunity." *Furtula v. Univ. of Kentucky*, 438 S.W.3d 303, 305 n.1 (Ky. 2014).

25

from Judge Makar's partial dissent. *Id.* at 1174-75. Consequently, Judge Makar concluded "Rojas has adequately alleged sufficient facts—buttressed by relevant documentation—to demonstrate that an express agreement exists such that the university has potential liability on a breach of contract claim." *Id.*

Although Judge Makar concurred in the majority's ruling to certify a question of law regarding sovereign immunity to the Florida Supreme Court, he clearly believed that the decision to dismiss the case based on sovereign immunity was premature—"erring on the side of caution, as courts are required to do at this initial stage of this lawsuit, countenances against dismissal in light of the written documentation and allegations presented." *Id.* at 1175. In short, the *Rojas* opinion does not apply the same rules of law as we do in Kentucky; and to the extent it does, it is the dissent, which agreed "that an enforceable written contract of some sort exists[,]" *id.*, that more closely comports with Kentucky law.

Finally, the University has made arguments pertaining to the millions of dollars in potential damages it could face if the students were successful on their claim. It has pointed time and again to the emergency nature of the Covid-19 pandemic. It has also argued the "reasonable expectations" of the contract with its students and prophesied a flood of litigation on diverse and sundry issues should this Court fail to find it has governmental immunity. No doubt, these are all serious concerns for the University. While courts must be able to determine the measure of damages, the vastness of those damages has

26

no relevance to the question of whether the University has a written contract with its students sufficient for waiver of governmental immunity under KRS 45A.245(1). The argument is essentially that because the damages may be really high, we should find governmental immunity. Kentuckians, however, have a higher expectation of this Court as impartial arbiters of the law than to accept such a blatantly results-oriented argument. The emergency nature of Covid-19 as the underlying motivation behind the University's decision to switch to all on-line classes and essentially shut down its campus is properly a defense to the breach of contract claim, and it is irrelevant to our analysis as to whether a written contract exists within the waiver of KRS 45A.245(1). Lastly, this Court has heard the "parade of horribles" argument before in a variety of contexts. Rarely has the party making it proved to be a Cassandra.[12]

## IV.   Addressing *Dixon*

The dissent's main point of contention is that this case is controlled by our ruling in *Dixon,* 483 S.W.3d 332 (Ky. 2015). Indeed, *Dixon* is the rock upon which the dissent has built its argument, but the gates of reason must prevail against it here. First, *Dixon* does not deal with governmental immunity but with the enforceability of an arbitration agreement. *Id.* at 336. The students were given a Student Enrollment Agreement, a one-page document, front and back. *Id.* The signature line was at the bottom of the front page, and directly above it there was a space for the students to initial, acknowledging they had "READ

---

[12] Cassandra was a Trojan princess blessed with the gift of prophecy but cursed to never be believed.

BOTH PAGES OF THIS STUDENT ENROLLMENT AGREEMENT". *Id.* at 345. The arbitration provision was contained on the back page of the document. *Id.* at 337. Two provisions were argued by Daymar in favor of incorporation by reference, the passage just quoted, *id.* at 345, and a provision which read, in part: "This Agreement *and any applicable amendments,* which are incorporated herein by reference, are the full and complete agreement between me and the College." *Id.* This provision was also contained on the front page of the agreement.

Although our ruling in *Dixon* certainly depended on incorporation by reference, it is wholly out of context with the peculiarities of the Student Enrollment Agreement at issue in that case to insist that it was the predominant reason. First, we noted that KRS 446.060 states when the law requires a writing to be signed, that signature must be at the "end or close of the writing." *Id.* at 343. We then held the Statute of Frauds was applicable because "when the Students signed the Agreement, they contemplated an obligation that could not be performed within a year." *Id.* at 344. Having made those determinations, we held the students signed their name on the bottom of the front page therefore there could no assurance they assented to the terms of the back page. *Id.* Unless those terms were validly incorporated, the Statute of Frauds would prevent enforcement.

As to incorporation by reference, we held "[i]t is beyond dispute that the arbitration provision, an original term in the Agreement, cannot be an 'applicable amendment.'" *Id.* at 345. Thus, the only true incorporation

provision by its plain terms did not apply to the back page of the document. The provision that the students had read the document, front and back, did not incorporate the back page terms because the word "read" cannot be understood to mean that the "Students actually assent to the terms referenced," nor could it be understood to mean "that any terms are actually being incorporated." *Id.* at 346. We then stated,

> the provision immediately preceding the "read" provision contains clear incorporation language—obviously, if Daymar had wished plainly to incorporate the terms on the reverse side of the Agreement, it knew how to do so. But with the "read" provision, Daymar seemingly attempted to notify the Students that the Agreement continued past their signature, rather than incorporate the back-page language above the signature. KRS 446.060 does not allow this—if it did, it would be rendered null.

*Id.* "In the end, Daymar's language is simply not clear enough to overcome KRS 446.060 and the requirement that parties show assent to be bound by terms of a contract." *Id.* Thus, our decision in *Dixon* was that the students had only assented to the terms on the front page of the document, and the words used by Daymar in an attempt to incorporate the back page of the document failed to do so either because the language was too specific—"applicable amendments"—or too vague—"read." Such distinctions are inapplicable in this case because the SFO stated the Students were entering a contractual obligation for tuition and fees, and the Bulletin plainly identified what those tuition and fees were.

The dissent attempts to avoid these legal and factual distinctions by simply stating the arbitration provision applied to the subject matter of the agreement. It did not. The Student Enrollment Agreement's terms on the front

page pertained to "what program the student is registering for; how many credits are required for that degree; an estimation of how long it will take to achieve those credits; and how much the program will cost with tuition, books, and fees." *Id.* at 337. Simply because an arbitration provision is included in a contract to resolve disputes arising under that contract does not mean it shares mutuality of subject matter with other provisions. Nothing about an arbitration provision is intrinsically related to a program being registered for, number of credits for a degree, or the cost of tuition, books, and fees.

Indeed, as *Dixon* succinctly stated, an arbitration agreement within a contract can be challenged "specifically [as to] the validity of the agreement to arbitrate" or the contract as a whole can be challenged. *Id.* at 340. Obviously, if it is possible that an arbitration provision within a contract can be invalid but not the contract as a whole, then it cannot be stated that arbitration provisions share mutuality of subject matter with the general contract simply by being contained within it.

*Dixon* thus applied and was overarchingly controlled by the Statute of Frauds. The facts of its Student Enrollment Agreement are not shared by the facts under the current case. The application of incorporation by reference depended on holding the words used to incorporate were either too specific or too vague. The arbitration provision sought to be incorporated does not share mutuality of subject matter. And the fact that it was physically attached to the back page of the contract was obviated by both the Statute of Frauds and KRS

30

446.060. *Dixon* does not apply to the case at hand hence we have no need to reconcile our present holding with it.

### V. Conclusion

The University offered its students a contract. It required them to agree to a "contractual financial obligation to pay tuition and fees[,]" in writing, in the Student Financial Obligation. Contemporaneously, it delivered to the Students the University Bulletin that set forth, in writing, the material terms of the tuition and fees according to, *inter alia*, whether the students were registering for on-campus classes or on-line classes. In exchange for the payments of the tuition and fees, the students had a legitimate expectation to receive what they paid for. These two documents were delivered together, share mutuality of subject matter, and the overwhelming implication and surrounding circumstances leave no doubt that they were meant to be read together, thereby forming one binding contract. Because the General Assembly has waived governmental immunity for all written contracts with the Commonwealth, the contract at issue is within the scope of the waiver. Therefore, the University is not entitled to assert governmental immunity and the breach of contract claim may proceed for adjudication on its merits. The Court of Appeals is affirmed.

All sitting. VanMeter, C.J.; and Lambert, J., concur. Thompson, J., concurs in result only by separate opinion. Bisig, J., dissents by separate opinion in which Nickell, J., joins and Keller, J., joins in result only. Nickell, J.,

31

dissents by separate opinion in which Bisig joins, and Keller, J., joins in result only.

THOMPSON, J., CONCURRING IN RESULT ONLY: The only issue for our Court to decide is whether there is a contract. The answer is yes. The University of Kentucky portal's Student Financial Obligation says in pertinent part: "Request and completion of registration constitutes a contractual financial obligation to pay tuition and fees for which I am liable."

I join in Justice Conley's majority opinion which rejects the University's contention that the only contract it had with the students is a "contract for registration" providing that in exchange for paying tuition and fees students are only granted an opportunity to register for classes. I write separately to clarify my understanding that our Court is only ruling upon the specific facts before it and not providing a wholesale endorsement to contract formation (and, thus, waiver of sovereign immunity) based on documents implicitly or explicitly referred to in an online agreement.

My sense of fundamental fairness is offended by the state retaining the additional money paid by these students for promised in-person classroom instruction and services that were abruptly terminated and not provided.

It is the specific facts in this specific case that warrant the conclusion that the case should proceed below. Whether the students will ultimately be entitled to some sort of reimbursement, or the amount of such payment, if any, is yet to be determined by the trial court.

32

BISIG, J., DISSENTING:  Less than ten years ago, this Court made clear in *Dixon v. Daymar Colleges Group, LLC*, 483 S.W.3d 332 (Ky. 2015), that a contract's mere reference to another writing is insufficient to incorporate that writing into the contract absent additional clear "language indicating [the other writing is] *actually being incorporated*."  483 S.W.3d at 346 (emphasis added).  In this case, the Student Financial Obligation (SFO) relied on by the Appellees is devoid of any language even referring to the tuition and fees information contained in the Bulletin, much less "clear language" indicating that the Bulletin's tuition and fees information was "actually being incorporated" into the SFO.

Yet today the majority opinion reaches the exact opposite conclusion from *Dixon,* relying on nineteenth-century cases to find the Bulletin incorporated into the SFO on the basis that "clear language of *incorporation*" is not required—rather, incorporation may be accomplished by a mere "clear reference to the document *being incorporated.*"  Indeed, the majority decision goes even *further,* holding that even where parties do *not* reference other writings in their agreement, such writings may nonetheless be incorporated by "implication" and "circumstance."

The majority thus concludes the University enjoys no governmental immunity against Appellees' claims that they are entitled to a refund of tuition and fees because the University temporarily offered remote rather than in-person classes and services in the early stages of the global COVID-19 pandemic.  This despite the fact that the SFO—the only purported written

33

contract relied upon by Appellees—contains no term guaranteeing in-person classes or services or promising the refund sought by the Appellees. And despite the fact that the SFO makes *only* the following reference to the University's Bulletin, the sole other writing relied upon by Appellees to support their claims—and which likewise contains no terms guaranteeing in-person classes or services or promising the refund sought by Appellees:

> Note: Copies of the Drug-Free Policy can be found in the UK Bulletin and Schedule of Classes which can be obtained from the Registrar's Office.

(Web addresses removed).

In so deciding, the majority opinion deeply undercuts the law of governmental immunity for our state colleges and universities. It also expressly disregards the significant impact of its conclusion, opening a floodgate of large-scale litigation against state universities—and indeed all state agencies entitled to governmental immunity—on the flimsy basis of alleged terms contained in *non-contractual* documents allegedly incorporated by "implication" and "circumstance." Because the majority decision marks a significant and unreasoned departure from current Kentucky law regarding incorporation by reference, and because it judicially expands the scope of the Commonwealth's waiver of governmental immunity far beyond the plain language of KRS 45A.245(1) which limits that waiver to claims on a "written contract," I respectfully dissent.

I.    **Under Current Kentucky Law, A Contract May Incorporate Another Writing Only By Clear Language Indicating The Other Writing Is Actually Being Incorporated.**

34

As a state agency, the University is entitled to "the benefits and protection of governmental immunity except where it has been explicitly waived by the legislature." *Furtula v. Univ. of Kentucky*, 438 S.W.3d 303, 305 (Ky. 2014). In KRS 45A.245(1) the General Assembly has provided such a waiver of governmental immunity for "claims based upon 'lawfully authorized written contracts with the Commonwealth.'" *Id.* (quoting KRS 45A.245(1)). However, because this statutory waiver is explicitly limited to claims on *written* contracts, "any provision that [the plaintiff] claims is breached must be included or incorporated in a written . . . agreement to be actionable." *Britt v. Univ. of Louisville*, 628 S.W.3d 1, 7 (Ky. 2021).

For other terms to be incorporated into a contract, first "'it must be clear that the parties to the agreement had knowledge of and assented to the incorporated terms.'" *Id.* at 8 (quoting *Dixon*, 483 S.W.3d at 344). Second, there also must be "clear language *expressing the incorporation* of [the] other terms and conditions." *Id.* (quoting *Dixon*, 483 S.W.3d at 344) (cleaned up) (emphasis added). The majority opinion posits that confusion has arisen in this case as to the meaning of the phrase "clear language expressing the incorporation of other terms and conditions." The majority turns to *M'Dowell v. Hall*, 5 Ky. 610 (1812), and *Dillingham v. Estill*, 33 Ky. 21 (1835), and concludes that what is required is not "clear language of *incorporation*—that the incorporated document shall control or decide the relation of the parties to the contract," but rather only "a clear reference to the document *being incorporated*."

35

I disagree. One need not travel with the majority back to 1812 to resolve the alleged confusion. Our 2015 decision in *Dixon* makes clear that under current Kentucky law, a mere reference to another writing in a contract does not incorporate that writing absent additional clear language indicating the writing is actually being incorporated.

In *Dixon*, the defendant college sought to compel arbitration based on an arbitration provision on the reverse side—and beneath the signature line—of a student enrollment agreement. *Dixon*, 483 S.W.3d at 336-37. The college argued the arbitration provision had been incorporated into the agreement by virtue of a paragraph on the front page of the agreement stating "I HAVE READ BOTH PAGES OF THIS STUDENT ENROLLMENT AGREEMENT BEFORE I SIGNED IT." *Id.* at 345.[13]

In considering the college's incorporation argument, this Court first noted that "[f]or a contract validly to incorporate other terms, . . . there must be 'clear language expressing the incorporation of [the] other terms and conditions.'" *Id.* at 344 (cleaned up) (quoting *Bartelt Aviation, Inc. v. Dry Lake Coal Co., Inc.*, 682 S.W.2d 796, 797 (Ky. App. 1985)). The Court then disagreed that the statement "I HAVE READ BOTH PAGES" satisfied this standard because it indicated only that the students had *read* the terms, without "any language indicating . . . that any terms are *actually being incorporated.*" *Id.* at 346 (emphasis added). In other words, because the statement merely referred

---

[13] Under KRS 446.060, the arbitration provision was not automatically part of the agreement because it appeared after the signature line. *Dixon*, 483 S.W.3d at 344.

to the other writing but did not include any language actually incorporating that writing into the agreement, the other writing was not incorporated by reference. The Court reasoned that absent clear language explicitly incorporating a referenced writing rather than merely pointing to it, "the requirement that parties show assent to be bound by terms of a contract" could not be satisfied. *Id.*

*Dixon* thus plainly held that under Kentucky law, mere reference to another writing in a contract is not sufficient to incorporate and bind the parties to that writing. Rather, the contract must use clear "language indicating" that the other writing is "actually being incorporated." *Id.*; *see also, e.g., Big Sandy Co., L.P. v. EQT Gathering, LLC*, 545 S.W.3d 842, 843-45 (Ky. 2018) (noting map was incorporated into contract where contract stated map was "made a part hereof"); *Buck Run Baptist Church, Inc. v. Cumberland Sur. Ins. Co., Inc.*, 983 S.W.2d 501, 503 (Ky. 1998) (finding other writing incorporated where contract stated other writing was made a part "the same as though it was set forth herein.").

Other authorities are consistent. For example, while the majority decision notes that Williston on Contracts states incorporation may be accomplished by clear reference and description of the writing to be incorporated, it omits the immediately preceding sentence from the treatise noting that this statement applies in "the situation in which the parties have *expressed their intention to have one document's provision read into a separate*

37

*document*." 11 Williston on Contracts § 30:25 (4th ed.) (emphasis added). Or

as noted in American Jurisprudence,

> In order for an instrument to be incorporated into and become part of a contract, the instrument must actually be incorporated; **it is not enough for the contract to merely mention the instrument, and the referring language in the contract must demonstrate the parties intended to incorporate all or part of the referenced instrument.**

17A AM. JUR. 2D *Contracts* § 381 (emphasis added).[14]

Nor is the majority opinion correct in asserting that our decision in *Britt* is consistent with a holding that incorporation may be accomplished without language actually incorporating the other writing. In *Britt,* the University of Louisville hired Dr. Britt as a professor and provided her with an initial letter setting forth a salary and work duties. *Britt,* 628 S.W.3d at 3. Subsequent annual letters provided for "continuation" of that employment. *Id.* at 7. Dr. Britt sued for breach of contract. *Id.* at 4. This Court held that although the subsequent letters did not include salary and work duty terms, damages could be calculated on the basis of prior performance because the parties intended Dr. Britt to perform substantially similar tasks for the same salary as her prior appointment. *Id.* at 7.

---

[14] The majority opinion refers to a comment to RESTATEMENT (SECOND) OF CONTRACTS § 132 as support for its conclusion because the comment states a signed writing may incorporate an unsigned writing by implication, physical attachment, or circumstances indicating it clearly relates to the same transaction and the parties have acquiesced. *See* cmt. c. However, this provision of the Restatement relates to a use of several writings to comprise a memorandum memorializing an *oral* agreement to satisfy the Statute of Frauds. It does not address the issue presented here, *i.e.* the method by which one writing may be incorporated into another *written* agreement. In any event, our analysis in *Dixon* is directly relevant Kentucky authority regarding incorporation of other writings into a written contract and thus should control over any allegedly contrary comment in the Restatement.

From this the majority opinion concludes the Court must have found that the initial letter was incorporated into the subsequent letters, even though the subsequent letters did not reference the initial letter. However, the question addressed by the Court when it considered prior performance was not whether the subsequent letters incorporated the original letter by reference, but rather whether the terms of the letters were sufficiently definite to allow for a calculation of damages. *Id.* Indeed, nowhere in the *Britt* opinion did the Court even consider, much less suggest or hold, that the subsequent letters incorporated the initial letter.[15]

Rather, the Court considered whether those letters incorporated the University's Redbook governance document and related policy statements. In addressing that issue, the Court once again noted that incorporation by reference may be accomplished only by "clear language *expressing the incorporation of [the] other terms and conditions.*" *Id.* at 8 (cleaned up) (emphasis added). The Court further noted that the letters stated the parties' agreement would be "governed" by and "subject to" the Redbook and

---

[15] The majority ponders how the Court in *Britt* "could . . . have found that the three latter letters of employment, which did not state the material terms of salary, were nonetheless a written contract for purposes of KRS 45A.245(1), when they did not have any language to the effect that the original employment letter's salary term would 'control, decide, or affect' the on-going employment relation between Britt and the University of Louisville?" The answer is simple: each subsequent letter stated it was a "continuation" of Dr. Britt's employment. *Id.* Though the Court was not faced with the issue and thus did not decide whether this was sufficient to accomplish incorporation, stating that a prior contractual relationship will "continue" is sufficiently clear language to refer to and actually incorporate that contract into a subsequent agreement. *See id.* ("Importantly, the letter provides that the University intends to *continue* Dr. Britt's employment. On its face, this indicates that—absent an agreement to the contrary—the parties intended for Dr. Britt to perform substantially similar tasks for the same compensation due under her prior appointment.").

accordingly found the Redbook incorporated because that language indicated the Redbook would "control, decide, or affect" the parties' contractual relationship. *Id.* *Britt* thus offers no support for the majority opinion's conclusion that incorporation may be accomplished by mere reference to another writing. To the contrary, *Britt's* holding that incorporation by reference was accomplished by language showing the other writing would "control, decide, or affect" the contract is entirely consistent with *Dixon's* holding that incorporation must be accomplished by clear language indicating the other writing is "actually being incorporated" into the parties' contract. *Dixon*, 483 S.W.3d at 346.

The two nineteenth-century cases relied upon in the majority opinion do not support departing from our current Kentucky law regarding incorporation. *M'Dowell v. Hall* simply held that where two contracts have conflicting terms, both "should be taken into consideration" to ascertain the parties' true intent. 5 Ky. at 611. *M'Dowell* did not address incorporation by reference. And though *Dillingham v. Estill* held that parol proof could be used to show that two instruments were part of a single agreement even where the instruments did not refer to one another, 33 Ky. at 23, its holding is contrary to our more recent jurisprudence requiring "clear language *expressing the incorporation* of" another writing, *i.e.* "language indicating . . . that [the other writing is] actually being incorporated." *Dixon*, 483 S.W.3d at 344, 346 (cleaned up) (emphasis added). *Dillingham* is also contrary to the general trend of the law requiring express language of incorporation and therefore should be overruled, not followed. *See*

40

17A AM. JUR. 2D *Contracts* § 381 ("[I]t is not enough for the contract to merely mention the instrument, and the referring language in the contract must demonstrate the parties intended to incorporate all or part of the referenced instrument."); *Jones v. Bituminous Cas. Corp.,* 821 S.W.2d 798, 801 (Ky. 1991) (recognizing "our obligation to modify or overrule precedent which is no longer viable in terms of present development of the law.").

In sum, *Dixon* plainly holds that another writing may be incorporated into a contract only by clear language indicating that the other writing is "actually being incorporated" into the parties' agreement. 483 S.W.3d at 346. A mere reference to another writing does not suffice, even if that writing regards the same subject matter as the contract. *See id.* The SFO relied on by Appellees contains no reference to the tuition and fees information contained in the Bulletin, much less "clear language" indicating that information was actually incorporated into the SFO. As such, I disagree with the majority's conclusion that the parties incorporated the Bulletin's tuition and fees information into the SFO and thus find no written contract sufficient to support a finding of waiver of the University's governmental immunity under KRS 45A.245(1).

## II. The Majority Decision Is A Judicial Expansion Of KRS 45A.245's Limited Waiver Of Governmental Immunity Only For Claims On "Written Contracts."

After setting forth its understanding that incorporation by reference requires only "a clear reference to the document being incorporated," the majority opinion then acknowledges the SFO does not even contain such a

41

reference to the Bulletin, the writing allegedly supplying the terms relied upon by Appellees: "the SFO does not expressly mention, point to, or adopt the Bulletin insofar as the Bulletin contains the requisite tuition and fee rates." No matter, the majority says: we can simply look to the "overwhelming implication and surrounding circumstances" to conclude the Bulletin's tuition and fees information is incorporated into the SFO. Again, I disagree.

First, *Dixon* wholly forecloses any conclusion that incorporation may be accomplished by looking to "implication" and "surrounding circumstances." In *Dixon*, the circumstances strongly suggested a connection between the student enrollment agreement and the arbitration provision. Indeed, the arbitration provision was found on the reverse side of the agreement, and the agreement itself pointed to it. *Dixon*, 483 S.W.3d at 337, 345. In addition, the arbitration provision plainly related to the same subject matter as the agreement—it provided a mechanism for resolution of disputes arising under the agreement. *Id.* at 337. Despite these circumstances and their implications, this Court found the agreement did *not* incorporate the arbitration provision given the lack of any clear "language indicating [the arbitration provision was] actually being incorporated." *Id.* at 346. The majority opinion's holding to the contrary today simply cannot be squared with *Dixon*.

Second, even if incorporation could be accomplished via implication and consideration of surrounding circumstances, it would result at most in an implied contract for which the General Assembly has not waived governmental immunity. An implied contract is one in which "some one or more of the terms

42

and conditions are to be implied from the circumstances or conduct of the parties." *Furtula*, 438 S.W.3d at 308 n.6 (quoting *Dorton v. Ashland Oil & Ref. Co.*, 303 Ky. 279, 197 S.W.2d 274, 275-76 (1946)). Such a contract is, by definition, not written. *Id.* ("By definition, '[a]n implied contract is one neither oral nor written . . . .'" (quoting *Hammond v. Heritage Commc'ns, Inc.*, 756 S.W.2d 152, 154 (Ky. App. 1988))). As we have repeatedly recognized, however, KRS 45A.245 waives governmental immunity only for claims on a "lawfully authorized *written contract.*" KRS 45A.245(1) (emphasis added); *Britt*, 628 S.W.3d at 5 ("KRS 45A.245 waived immunity for all *written* contracts with the state . . . .") (emphasis added). The plain language of the statute—which as a waiver of immunity must be strictly construed—references no waiver of claims based on implied contracts. *See Jones v. Cross*, 260 S.W.3d 343, 345 (Ky. 2008) ("Statutes in derogation of the state's sovereign immunity will be strictly construed in favor of the state unless the intention of the legislature to do otherwise is clearly expressed in the statute.").

Yet here the majority decision concludes the University does not have governmental immunity from the Appellees' claims even though those claims are premised on terms not contained or explicitly incorporated in the written contract, but rather divined from "overwhelming implication and surrounding circumstances." Where, as here, one must resort to implication and surrounding circumstances to determine the terms of a contract, the contract is by definition implied rather than written. The majority's decision thus judicially expands the scope of the governmental immunity waiver provided in

43

KRS 45A.245 to include not only written contracts, but also implied contracts. I therefore also disagree with the majority's conclusion that a contract claim against the state premised on incorporation purportedly accomplished by implication and circumstance may proceed without violating KRS 45A.245's express limitation of waiver to claims on written contracts.

It is beyond cavil that Appellees' claims are not premised on the terms of any "written contract." The majority states:

> [I]t is clear the Appellees and the University entered into a written contract offered by the University, to receive a collegiate-level education in exchange for the payment of an applicable tuition, based on the registered classes, at a rate determined by the University; and to the use of ancillary services offered by the University such as (but not limited to) health services and recreational facilities in exchange for the mandatory fees.

Yet the majority opinion points to no *written* contractual language setting forth any such terms. This is unsurprising, given that no such writing appears in the record. Perhaps those are the terms the majority imagines *should* constitute the basis of the relationship between the University and its students. But "[t]here is no better established rule of law in this state than that a court cannot make a contract for the parties, but can only construe the contract it finds they have entered into. Nor has the court the authority to read words into a contract." *Big Sandy Co.*, 545 S.W.3d at 847 (quoting *Alexander v. Theatre Realty Corp.*, 253 Ky. 674, 70 S.W.2d 380, 387-88 (1934)). The majority errs in doing so here.[16]

---

[16] The dangers inherent in a judicial imposition of unwritten contractual terms are evident in the majority's conclusion that the parties here must have agreed tuition would be assessed "at a rate determined by the University." The Council on

**III. Even If The Majority Opinion's View Of Incorporation Was Correct, The Bulletin Would Be Incorporated Only For Purposes of the Drug-Free Policy.**

Finally, it again bears noting that the *only* reference to the Bulletin in the SFO is as follows:

> Note: Copies of the Drug-Free Policy can be found in the UK Bulletin and Schedule of Classes which can be obtained from the Registrar's Office.

(Web addresses removed). Even assuming a contract could incorporate another writing by mere reference, the language of the SFO makes clear such incorporation would be for purposes of the Drug-Free Policy only.

Where parties reference only a portion of another writing in their contract, only the referenced portion is incorporated and only for the specific purposes indicated. *See Twin City Fire Ins. Co. v. Terry*, 472 S.W.2d 248, 249 (Ky. 1971) ("Where a writing refers to another document, that other document, *or so much of it as is referred to*, is to be interpreted as part of the writing." (quoting 4 Williston on Contracts § 628 (1961))) (emphasis added). Or as stated in Williston on Contracts,

> When a writing refers to another document, that other document, *or the portion to which reference is made*, becomes constructively a part of the writing . . . . [I]t is important to note that when incorporated matter is referred to for a specific purpose only, it

---

Postsecondary Education—not the University—determines tuition rates at Kentucky public universities, including at the time the Appellees registered. KRS 164.020(8)(a) ("The Council on Postsecondary Education shall . . . [d]etermine tuition . . . ."); 13 KAR 2:045 ("KRS 164.020(8) requires the Council on Postsecondary Education to determine tuition . . . ."); 13 KAR 2:050 § 1 ("The Council on Postsecondary Education sets the tuition for all students enrolled in each public institution of higher education [including the] University of Kentucky . . . .") (expired Mar. 1, 2020 pursuant to KRS 13A.3102).

> becomes a part of the contract for that purpose only, and should be treated as irrelevant for all other purposes.

11 Williston on Contracts § 30:25 (4th ed.) (emphasis added); *see also* 17A AM. JUR. 2D *Contracts* § 381 ("[A] reference in a contract to another instrument will incorporate the other instrument only to the extent indicated and for the specific purpose indicated."). Here, even if one could conclude the parties manifested sufficient assent to incorporate some portion of the Bulletin into the SFO, such assent could only be to inclusion of the Bulletin's Drug-Free Policy as referenced in the SFO. This reference is plainly insufficient to also incorporate the Bulletin's tuition and fees information. I disagree with the majority's conclusion to the contrary.

In sum, the majority decision's holding that mere reference to another writing suffices to incorporate that writing into a contract is directly contrary to our holding in *Dixon* that mere reference is *not* enough absent additional clear "language indicating . . . [the other writing is] actually being incorporated." *Dixon*, 483 S.W.3d at 346. In addition, the majority opinion's finding that the Commonwealth does not have governmental immunity against claims premised on terms found solely by implication and circumstance judicially expands KRS 45A.245 beyond its plain language to waive governmental immunity not only as to claims on written contracts, but also as to claims on implied contracts. Finally, the majority decision also ignores the express language of the SFO indicating that if the Bulletin were incorporated at all, it would be solely for purposes of the Drug-Free Policy.

Because Appellees' claims are not based on any terms set forth in a written contract or incorporated into a written contract with the University, I would find that the University has governmental immunity against the Appellees' claims and reverse the Court of Appeals and the Franklin Circuit Court. For the foregoing reasons, I respectfully dissent.

Nickell, J., joins. Keller, J., concurs in result only.

NICKELL, J., DISSENTING: I respectfully dissent. Morally, a governmental entity should not be shielded from an alleged breach of its obligations any more than the average citizen. *See Cullinan v. Jefferson Cnty.*, 418 S.W.2d 407, 411 (Ky. 1967) (Palmore, J., dissenting), *overruled by Yanero v. Davis*, 65 S.W.3d 510 (Ky. 2001)). Nevertheless, the application of governmental immunity is mandated under Section 231 of the Kentucky Constitution. *Id.* Although I share the frustration of my fellow Justices with the apparent unfairness[17] of the present situation, the Students cannot overcome the University's immunity because the enrollment procedure and associated materials do not amount to an express written contract.

---

[17] I would further note the wisdom or efficacy of the University's response to the COVID-19 pandemic is not a question properly before us. Generally, courts do not interfere with the operations of a university in the absence of a clear legal violation. *Lexington Theological Seminary, Inc. v. Vance*, 596 S.W.2d 11, 14 (Ky. App. 1979). Prior to the COVID-19 pandemic, courts afforded colleges and universities the necessary flexibility and discretion to respond to emergencies that required the closing of campus. *See, e.g., Roe v. Loyola Univ. New Orleans*, No. 07-1828, 2007 WL 4219174, at *1-2 (E.D. La. Nov. 26, 2007) (dismissing breach of contract claim where law school transferred students to a nearby law school for one semester while campus was closed following Hurricane Katrina); *Paynter v. New York Univ.*, 66 Misc.2d 92, 319 N.Y.S.2d 893, 893 (App. Div. 1971) (dismissing breach of contract claim where defendant suspended classes following anti-war student protests and shooting at Kent State University).

Under Kentucky law, the relationship between an enrolled student and a college or university is undoubtably contractual in nature.[18] *Lexington Theological Seminary, Inc. v. Vance*, 596 S.W.2d 11, 14 (Ky. App. 1979) (citing 15A Am. Jur. 2d *Colleges and Universities* § 31). However, the fact that a university is contractually obligated to its students "merely begs the question of what has been promised." *See Center Coll. v. Trzop*, 127 S.W.3d 562, 568 (Ky. 2003) (quoting *Fellheimer v. Middlebury Coll.*, 869 F.Supp. 238, 243 (D. Vt. 1994)). Many courts have recognized that express contracts between students and universities "are rarely prepared." *Wickstrom v. North Idaho Coll.*, 111 Idaho 450, 725 P.2d 155, 157 (1986). Indeed, enrollment at a university typically gives rise to an implied contract, "and if the student complies with the terms prescribed by the university and completes the required courses, the university must award the student a degree." 15A Am. Jur. 2d Colleges and Universities § 25; 14A C.J.S. Colleges and Universities § 42. The rights and obligations of the parties as contained in the bulletins, handbooks, and regulations made available to the student become a part of the implied contract. *See Vought v. Teachers College, Columbia Univ.*, 127 A.D.2d 654, 511 N.Y.S.2d 880, 881 (2nd Dep't. 1987); *Ali v. Univ. of Louisville*, No. 3:17-cv-00638-RGJ, 2019 WL 539098, at *9 (W.D. Ky. Feb. 11, 2019); and *Green v.*

---

[18] While published Kentucky decisions often concern the relationship between a student and a private educational institution, the same rule can be applied to public universities. *See, e.g., Healy v. Larsson*, 67 Misc.2d 374, 323 N.Y.S.2d 625, 626 (N.Y. 1971).

*Sandy*, No. 5:10-CV-367-JMH, 2011 WL 4688639, at *4 (E.D. Ky. Oct. 3, 2011).

In the present appeal, the Student Financial Obligation ("SFO") unquestionably references the contractual relationship between the Students and the University. However, simply because a written document references a contractual obligation does not necessarily mean the written document is, itself, an express written contract. "A written contract is one which is all in writing, so that all its terms and provisions can be ascertained from the instrument itself." *Mills v. McGaffee*, 254 S.W.2d 716, 717 (Ky. 1953). The traditional rule is that "a written instrument which sets forth the undertaking of the persons executing it or discloses terms from which such an undertaking can be imported, and which shows the consideration for the undertaking, and which identifies the parties thereto, will be considered a contract in writing." *Id.*

Moreover, when an action is based upon a written contract, "the action must be upon the writing and it is not enough that the evidence by which the cause of action is supported is in writing." *Held v. Held*, 137 F.3d 998, 1001 (7th Cir. 1998) (quoting *Ames v. Crown Life Ins. Co. of Toronto, Canada*, 85 Ill.App.3d 203, 40 Ill.Dec. 521, 525, 406 N.E.2d 222, 226 (1980)). Here, neither the SFO nor the Bulletin recites the material terms or promises concerning in-person instruction and other services which the Students are seeking to enforce in this litigation. Instead, the Students have sought to amalgamate a disparate series of written documents into a single written

49

contract. Crucially, the lack of definite, material terms in the purported written contract, coupled with the nature of the student-university relationship, distinguishes the present appeal from our decision in *Britt*. 628 S.W.3d at 6.

In *Britt*, we held a series of letters constituted a written employment agreement when the letters specified the employee's salary, the duration of employment, and details concerning the receipt of work assignments. *Id.* Additionally, the letters explicitly incorporated "all rules and regulations promulgated on the authority of the University of Louisville Board of Trustees and the governance document known as *The Redbook*." *Id.* at 8. The purported written contract in the present appeal does not approach the specificity of terms underlying our decision in *Britt*. Further, without sufficiently definite terms, I am "left to wonder" which specific terms the parties intended to constitute the original terms of the agreement and which terms were incorporated by reference. *See Dixon*, 483 S.W.3d at 345. Such puzzlement epitomizes implied terms as opposed to those expressly written.

In the absence of clear language signifying the mutual intent of the parties to so bind themselves, I cannot conclude a written contract exists. Again, I do not lightly discount the harsh result mandated by governmental immunity. Otherwise, the Students could have proceeded under an implied contract theory. Nonetheless, Kentucky courts cannot draft contracts for the benefit of one party or the other. *See Frear v. P.T.A. Indus., Inc.*, 103 S.W.3d 99, 106 (Ky. 2003). Therefore, I dissent.

Bisig, J., joins.  Keller, J., concurs in result only.

COUNSEL FOR APPELLANT:

Joshua M. Salsburey
Donald C. Morgan
Sturgill, Turner, Barker, Moloney, PLLC

William E. Thro
Shannan B. Stamper
University of Kentucky Office of Legal Counsel

COUNSEL FOR APPELLEE:

Andre F. Regard
Ivey L. Workman
Regard Law Group, PLLC

COUNSEL FOR AMICI CURIAE, EASTERN KENTUCKY
UNIVERSITY, MURRAY STATE UNIVERSITY, NORTHERN KENTUCKY
UNIVERSITY, UNIVERSITY OF LOUISVILLE, AND WESTERN KENTUCKY
UNIVERSITY:


Donna K. Perry
Jeremy S. Rogers
Alina Klimkina
August Johannsen
Dinsmore & Shohl LLP